PEOPLE v WATKINS

PEOPLE v HUNTER

PEOPLE v PHILLIPS

Docket Nos. 86776, 86806, 87091. Argued April 4, 1991 (Calendar Nos. 9-11). Decided September 19, 1991. Certiorari denied by the Supreme Court of the United States on January 21, 1992, 502 US — (1992).

Donald Watkins, Christian Phillips, and others were convicted by a jury following a joint trial in the Detroit Recorder's Court, Michael J. Talbot, J., of first-degree murder, assault with intent to commit murder, kidnapping, and possession of a firearm during the commission of a felony. Michael Hunter was convicted following the same trial of first-degree murder and assault with intent to commit murder. The Court of Appeals, DANHOF, C.J., and WAHLS and GRIFFIN, JJ., affirmed, finding no error in the admission of unredacted confessions of two codefendants, as declarations against penal interest, for use as substantive evidence against the other defendants, because they bore sufficient trustworthiness to overcome any presumption of unreliability (Docket Nos. 103572, 104523, 104682). The defendants appeal.

In opinions by Chief Justice CAVANAGH, joined by Justice LEVIN; and by Justice BRICKLEY, joined by Justice GRIFFIN, the Supreme Court held:

Admission of the confessions of the codefendants was error, and the error was not harmless, requiring reversal of the defendant's convictions and remand for retrial without the use of the confessions.

Chief Justice CAVANAGH, joined by Justice LEVIN, further stated:

MRE 804(b)(3) provides for the admission as substantive evidence of hearsay statements against interest. If a hearsay statement is not properly a statement against interest and no other exception applies, its admission is error. Confidence in the trustworthiness of a purported statement against interest extends only insofar as the specific factual assertions contained within the statement are against the declarant's interest. The presumed trustworthiness of a statement against interest de-

rives not from the circumstances in which the statement is made or from the general mental condition of the declarant, but only from the specific factual character of the statement itself. A statement is trustworthy precisely, and only, to the extent that it is, in fact, against the interest of the declarant. Generally, accusatory statements in codefendant confessions almost never will qualify as statements against interest.

Even if the rule asserted by the opinion for affirmance, i.e., that discrete assertions within a broader statement are admissible because they are to be viewed as being against interest— even though they are not against and may even favor the interest of the declarant—on the ground that other assertions within the statement that are against the declarant's interest carry over and permeate the statement with an aura of trustworthiness, were appropriate in some circumstances, the overwhelming weight of authority emphatically rejects the extension of such a rule to the context of accusatory statements in accomplice confessions because of their uniquely suspect and inherently unreliable character.

In this case, the law and facts clearly dictate that the statements at issue were not statements against interest under MRE 804(b)(3). Having chosen to confess their own involvement in the crime, the declarants had nothing to lose by inculpating the defendants, but, rather, had much to gain. Thus, the confessions are inadmissible hearsay, and their admission as evidence against the defendants at trial was erroneous.

Furthermore, admission of the codefendants' confessions violated the defendants' right of confrontation under both the United States and Michigan Constitutions in that they did not possess sufficient indicia of trustworthiness to overcome the strong presumption of unreliability inhering to custodial codefendant confessions generally.

Because the Michigan rules excluding hearsay and the constitutional right of confrontation plainly were violated, and because the error in admitting the statements was not harmless beyond a reasonable doubt, the convictions should be reversed and the cases remanded for retrial without admission of the statements.

Justice BRICKLEY, joined by Justice GRIFFIN, concurring, further stated:

While the trial court erroneously allowed admission of the codefendants' confessions and that that error was not harmless, resolution of the issue whether admission of codefendant statements should be limited only to statements contrary to a declarant's penal interest as an exception to the hearsay rule

should be left for another day because the issue was not raised by the parties in the trial court or the defendants on appeal, and the people only raised it in a footnote in this Court.

The reliability of the custodial confessions at issue does not bear the particular guarantees of trustworthiness for purposes of the Confrontation Clause. Both the circumstances surrounding them, as well as their substance, mitigate against admissibility, even without considering their presumptive unreliability or resolution of the application of the hearsay exception pertaining to statements against interest.

Reversed and remanded.

Justice RILEY, joined by Justices BOYLE and MALLETT, stated:

Introduction of the nontestifying declarants' unredacted statements that implicated the defendants was not error, and consequently did not violate the Confrontation Clause of either Const 1963, art 1, § 20 or US Const, Am VI.

Inculpatory statements should be admitted under MRE 804(b)(3) if they withstand an examination of their trustworthiness at the time of their making. The proponent must show that the statement directly implicates the declarant in the crime and that any collateral portion of the statement is so temporally and contextually related to the disserving portion as to be equally trustworthy. On the basis of this principle, the statements at issue were properly admitted as declarations against penal interest; reliability and truthfulness were clearly established.

Because the Confrontation Clause and the hearsay rules are designed to protect similar values and stem from the same roots, reliability will be presumed where evidence falls within a firmly rooted hearsay exception. Otherwise, the prosecution must show that hearsay evidence bears particularized guarantees of trustworthiness. In this case, the foundation for declarations against penal interest requires more than indicia of reliability, it requires unavailability and establishing that the statements are so contrary to penal interest that a reasonable person would not have made them unless they were true. Even without the corroborating evidence, the circumstances surrounding the making of the statements are sufficient for Confrontation Clause purposes.

Whether an out-of-court statement bears sufficient indicia of reliability to satisfy the requirements of the Confrontation Clause depends on the particular circumstances under which the statement was made. Among the factors to be considered in overcoming the presumption of unreliability are whether the statement was made voluntarily, whether the statement was

made contemporaneously with the events it refers to, whether the declarant admitted acting in a manner contrary to penal interest, whether the statement was corroborated, whether the declarant had personal knowledge of the matters addressed, whether the statement was spontaneous, and whether the person to whom the statement was made was someone to whom the declarant would be likely to speak truthfully. In this case, the reliability requirement of the Confrontation Clause was met.

The statements made by both nontestifying codefendants were so contrary to their penal interests that they had to be true. In addition, the statements demonstrate personal knowledge of the matters addressed, and, on all material points, were consistent and bear the particular guarantees of trustworthiness required by the Sixth Amendment. There is no difficulty in concluding that a reasonable person in the codefendants' positions would not have made the statements unless they believed them to be true. Therefore, the trial court did not err in permitting the jury to consider substantively the statements as declarations against penal interest.

178 Mich App 439; 444 NW2d 201 (1989) reversed.

*Frank J. Kelley,* Attorney General, *Gay Secor Hardy,* Solicitor General, *John D. O'Hair,* Prosecuting Attorney, and *Timothy A. Baughman,* Chief, Research, Training and Appeals, for the people.

*Chodak & Robiner* (by *Norman R. Robiner*) for defendant Watkins.

*Gerald M. Lorence* for defendant Hunter.

*Daniel J. Rust* for defendant Phillips.

CAVANAGH, C.J. Two distinct, though interrelated, issues arise in this case: (1) whether the accusatory hearsay statements inculpating the complaining defendants, contained within the codefendant confessions at issue, fall within the "statement against interest" exception of MRE

804(b)(3), and (2) whether the admission of those statements as substantive evidence against the complaining defendants violated their rights—under both the United States and Michigan Constitutions—to confront the witnesses against them. We discuss the first issue in part II(A) and the second issue in part II(B). We discuss in part II(C) whether the admission of the codefendant confessions at the joint trial, whether that be deemed evidentiary or constitutional error or both, can be deemed harmless with regard to any of the complaining defendants.

### I. FACTS

Although we generally adopt the statement of facts in the dissent, see *post,* pp 679-682, we find it necessary to revisit the crucial, disputed codefendant confessions by Kerry Jordan and Walter Miller. The complete text of those statements is set forth in appendices to the dissent. Even a casual reading of the confessions leads to the unavoidable conclusion that they contain precisely the kind of inherently suspect and unreliable accusatory hearsay which has historically concerned courts and commentators. Codefendant Jordan said it all when he responded to the interrogator's question, "Why are you telling me [this statement]," by saying: *"Because I'm not going to take the fall alone." Post,* p 706 (emphasis added).

We set forth in the appendix to this opinion the specific statements in the confessions that appear to inculpate, directly or indirectly, one or more of the complaining defendants, with the surnames of the participants substituted for the various nicknames used in the confessions. See *post,* pp 668-676.

## II. ANALYSIS

### A. THE HEARSAY ISSUE

MRE 802 provides that hearsay evidence is not admissible except where the rules provide otherwise. MRE 804(b)(3), worded almost identically to FRE 804(b)(3),[1] provides for the admission as substantive evidence of hearsay "statements against interest," defined as follows:

> *Statement against interest.* A statement which was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject him to civil or criminal liability, or to render invalid a claim by him against another, that a reasonable person in his position would not have made the statement unless he believed it to be true. A statement tending to expose the declarant to criminal liability and offered to exculpate the accused is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement.[2]

Michigan, unlike the United States and many other states, has not adopted any "catch-all" exception to the rule against hearsay, cf. FRE 803(24); FRE 804(b)(5), and no other exception has been suggested or appears to apply to the disputed hearsay statements in this case. Thus, if those statements do not properly constitute statements against interest, their admission was erroneous.

It is undisputed that Jordan's and Miller's confessions each contain numerous specific statements

---

[1] The only difference is that the Michigan rule refers to a "reasonable person" rather than a "reasonable man."

[2] A condition for the admissibility of a statement against interest under MRE 804(b)(3) is that the declarant be shown to be unavailable under MRE 804(a). It is undisputed that declarants Jordan and Miller were unavailable in this case because they asserted their Fifth Amendment privilege not to testify. See MRE 804(a)(1).

admitting their own involvement in the crime, which were clearly against their penal interests when made and would therefore undoubtedly be admissible as substantive evidence against anyone under MRE 804(b)(3).[3] Those statements, however, are not the ones that concern us here. The relevant issue is whether the various statements detailed in the appendix, *inculpating the complaining defendants,* are also admissible under MRE 804(b)(3) simply because they appear within the same confession as statements concededly against the confessor's interest, or whether each discrete and specific statement must be shown to *separately and intrinsically* satisfy the requirements of MRE 804(b)(3).

The dissent would follow a "carry-over" rule.[4] Under this rule, discrete assertions within a broader statement are viewed as against interest and therefore admissible—even though they, specifically, are *not* in fact against the interest of the

[3] We thus do not hold, as the dissent erroneously suggests, see *post,* pp 689-690, that statements against penal interest are *categorically* inadmissible to inculpate an accused. We agree that the framers of FRE 804(b)(3), on which our own MRE 804(b)(3) is modeled, forswore such a simplistic approach, which would have rendered all our present discussion superfluous. As we discuss in n 14, it is indeed possible to envision hypothetical statements in accomplice confessions which would be admissible against an accused under MRE 804(b)(3). In any event, we reject the seemingly result-oriented criticism that we render MRE 804(b)(3) "meaningless," *post,* p 690, simply because our analysis will make it more difficult for the prosecution to introduce statements in accomplice confessions to inculpate the accused. The only proper inquiry is whether any given statement is indeed—truly, properly, and *specifically* analyzed—a "statement against interest." Whatever results flow from our analysis simply reflect the true and proper scope of MRE 804(b)(3).

[4] The dissent devotes substantial discussion to the historical issue regarding whether statements against *penal* interest should generally enjoy the same presumption of reliability as statements against *economic* interest. See *post,* pp 685-689. We are puzzled by this discussion because we have absolutely no disagreement on this point with the dissent, nor is this issue even disputed in this case. Our primary disagreement with the dissent regarding MRE 804(b)(3) concerns the carry-over rule.

declarant, and may even *favor* the interest of the
declarant—on the theory that the trustworthiness
of *other* assertions within the broader statement
(which *are* concededly against the declarant's in-
terest) "carries over" and permeates the entire
statement with a sort of aura of trustworthiness.
Simply to state the rule suggests its inherent
implausibility. As we discuss below, the rule is
neither generally sound nor, more importantly,
can it properly be applied in the special context of
accusatory hearsay statements in codefendant con-
fessions, with their unique and long-recognized
dangers of self-serving unreliability.

The most distinguished authority which might
arguably be read to support the carry-over rule is
Dean Wigmore's treatise, which states that

> [s]ince the principle is that the statement [against
> interest] is made under circumstances fairly indi-
> cating the declarant's sincerity and accuracy
> (§ 1457 . . .), it is obvious that the situation indi-
> cates the correctness of whatever he may say
> while under that influence. In other words, the
> statement may be accepted, not merely as to the
> specific fact against interest, but also as to *every
> fact contained in the same statement.* [5 Wigmore,
> Evidence (Chadbourn rev), § 1465, p 339. Emphasis
> in original.]

But this passage leaves undefined the scope of the
"statement." Does "statement" refer to the nar-
rowest discrete or severable assertions uttered by a
declarant? Or, as the dissent apparently assumes
without analysis, does "statement" automatically
encompass an entire confession which may run
many pages and contain dozens if not hundreds of
discrete and severable assertions? In other words,
how does one determine whether a given state-
ment is truly and properly "contained in" a state-

ment against interest? Wigmore, referring to "the living principle" underlying the exception, states that "a . . . useful test appears to be this: All parts of the speech or entry may be admitted which appear to have been made while the declarant was in the trustworthy condition of mind which permitted him to state what was against his interest." *Id.* at 341.

Unfortunately, with all due respect to Dean Wigmore, the quoted passages suggest a fundamental misunderstanding of the "living principle" which in fact underlies the statement against interest exception. Wigmore's references to the declarant's "trustworthy condition of mind," to the "circumstances" under which the statement is made, and to what the declarant says "while under that influence" depart from the true and proper rationale for trusting the reliability of statements against interest.[5] That rationale, properly understood, has nothing to do with the situational or environmental "circumstances" or pressures surrounding the declarant as he makes the statement. The declarant is not necessarily in any generally "trustworthy condition of mind," nor is he under any "influence" which would automatically render *anything* he said at that time and under those "circumstances" trustworthy.

Rather, as Wigmore himself states, "[t]he basis of the exception is the principle of experience that a statement asserting a fact distinctly against one's interest is unlikely to be deliberately false or heedlessly incorrect . . . ." *Id.,* § 1457, p 329. In

[5] There is nothing novel or unprecedented in questioning Dean Wigmore's reasoning, sound though it generally is. The United States Supreme Court recently rejected his reasoning on another important point relating to the Sixth Amendment right of confrontation. See *Coy v Iowa,* 487 US 1012, 1018, n 2; 108 S Ct 2798; 101 L Ed 2d 857 (1988) (criticizing and rejecting Wigmore's view of the relationship between visual confrontation at trial and cross-examination).

other words, the rule is based on the common-sense intuition that a reasonable person would be expected to lie, if at all, only in his own favor, and would not harm himself by his own words. " 'The principle is founded on a knowledge of human nature. Self-interest induces men to be cautious in saying anything against themselves, but free to speak in their own favor. We can safely trust a man when he speaks against his own interest.' " *Id.,* quoting *Gibblehouse v Stong,* 3 Rawle 437, 438 (Pa, 1832).

It thus follows by the most elementary logic that our confidence in the trustworthiness of a purported statement against interest extends only insofar as the specific factual assertions contained within the statement are, in fact, against the declarant's interest. "Such a statement . . . has a guaranty of trustworthiness only insofar as the truth-telling stimulus of the declarant is operative; that is only insofar as the statement *or portions of the statement,* is against the declarant's interest." *Deike v Great Atlantic & Pacific Tea Co,* 3 Ariz App 430, 433; 415 P2d 145 (1966) (emphasis added), cited and quoted in 5 Wigmore, § 1465, p 340, n 2.

The rationale for the statement against interest exception is thus fundamentally different from the rationale for many of the other traditional hearsay exceptions, such as those admitting dying declarations and excited utterances. As the United States Supreme Court has recently noted:

The basis for the "excited utterance" exception, for example, is that such statements are given under circumstances that eliminate the possibility of fabrication, coaching, or confabulation, and that therefore the circumstances surrounding the making of the statement provide sufficient assurance that the statement is trustworthy and that cross-

examination would be superfluous. Likewise, the "dying declaration" . . . exception[ ] to the hearsay rule [is] based on the belief that persons making such statements are highly unlikely to lie. See, e.g., *Mattox* [*v United States,* 156 US 237,] 244; 15 S Ct 337; 39 L Ed 409 [1895] ("[T]he sense of impending death is presumed to remove all temptation to falsehood, and to enforce as strict an adherence to the truth as would the obligation of oath"); *Queen v Osman,* 15 Cox Crim Cas 1, 3 (Eng N Wales Cir, 1881) (Lush, L.J.) ("[N]o person, who is immediately going into the presence of his Maker, will do so with a lie upon his lips") . . . . [*Idaho v Wright,* 497 US 805, —; 110 S Ct 3139; 111 L Ed 2d 638, 655 (1990) (some citations omitted); see also MRE 803(2), 804(b)(2).]

Under the logic of these and similar hearsay exceptions, it might well be said that the presumed trustworthiness of the statement derives from the permeating influence of the situation in which the declarant finds himself as he utters the statement, and from his general mental condition thereby created, and that any associated statements made around the same time and under the same circumstances can be presumed to absorb and share that trustworthiness.

It would defy logic and common sense, however, to suppose that the motive for truthfulness presumed to underlie a discrete, specific assertion against interest possesses any such permeating influence, or could somehow cloak all collateral assertions with an equivalent aura of reliability. The presumed trustworthiness of a statement against interest derives not from the circumstances in which the statement is made, or from the general mental condition of the declarant, but only from the specific factual character of the statement itself. The statement is trustworthy

*precisely,* and *only,* to the extent that it is, in fact, against the interest of the declarant.[6]

Wigmore himself, in several passages, actually seems to reject the logic of the carry-over rule. For example, Wigmore specifically cautions that "[i]t must be remembered that it is not merely the statement that must be against interest, but the *fact stated.* It is because the fact is against interest that the open and deliberate mention of it is likely to be true." 5 Wigmore, § 1462, p 337 (emphasis in original).[7] In another passage, Wigmore emphasizes the need to parse very carefully the specific factual content of discrete assertions, and to avoid any careless assumption that a declarant's motivation either to lie or tell the truth with regard to one assertion necessarily carries over to any collateral assertion:

> A common illustration of this question is the use of a merchant's *credit entry* of payment received (thus against his interest) which at the same stroke has included (thus in favor of his interest) the *debit entry* of his claim leading to the payment; and, conversely, an agent's debit and credit account in which the receipts creating liability are on the whole equalled or exceeded by the payments or credits in his favor. When (in the former case) the entry of payment received, or (in the latter case) of an item creating liability is sought to be used, the argument has been made that

[6] This analysis is consistent with that offered nearly half a century ago by Professor Bernard Jefferson. See Jefferson, *Declarations against interest: An exception to the hearsay rule,* 58 Harv L R 1, 59-63 (1944).

[7] It is really quite curious that Wigmore overlooks the obvious and basic conflict between the logic of this passage and the carry-over rule suggested in § 1465. The notion that "the statement may be accepted, not merely as to the specific fact against interest, but also as to *every fact contained in the same statement,*" § 1465, p 339 (emphasis in original), is utterly at war with the eminently logical reminder that "[i]t is because the *fact* is against interest that the open and deliberate mention of it is likely to be true," § 1462, p 337 (emphasis added).

since, taking both sides of the account together, the entrant is not left with any liability and perhaps appears to have a claim for a balance, the matter *cannot be said to be against his interest.* This argument . . . has since been repudiated. The answer to it is that the entrant's interest in making the favoring items does not really affect, as a countermotive, his interest against the individual charging items; the entries of the latter, taken by themselves, are to be trusted. [*Id.,* § 1464, pp 338-339. Emphasis in original.]

Applying Wigmore's logic in this passage, if the declarant's motivation to make a discrete assertion *in* his interest "does not really affect" his incentive *not* to make a separate but closely associated assertion *against* his interest, then the reverse must also be true: The declarant's incentive not to make the assertion against interest does not logically lend any credibility to separate, even though closely associated, assertions not sharing that disincentive. Statements *not* against interest, "taken by themselves," are *not* "to be trusted."

The case law rejecting the carry-over rule is both ample and persuasive. *Deike v Great Atlantic & Pacific Tea Co, supra,* although a civil case, is squarely on point. *Deike* involved an action for conversion against the estate of a man who had allegedly robbed one of the plaintiff's A&P stores. The trial court admitted as evidence of the decedent's guilt the custodial confession of a man who stated that he had robbed the store together with the decedent and another man. The court found this to be error requiring reversal because

there is no showing that *that part of* [*the declarant's*] *statement implicating* [*the decedent*] in the Seattle robbery was in fact against the declarant's interest—pecuniary, proprietary, penal or otherwise. There is no showing that [the declarant] felt

any compelling obligation *as to the truthfulness of his implication of [the decedent]*. This Court can only speculate upon the inducements or reasons which prompted [the declarant] to make the declaration. [3 Ariz App 433. Emphasis added.]

The California Supreme Court rejected the carry-over rule in *People v Leach,* 15 Cal 3d 419; 124 Cal Rptr 752; 541 P2d 296 (1975), which involved the hearsay statements of two codefendants that each were introduced as evidence against both. The court stated:

[W]e construe the exception to the hearsay rule relating to evidence of declarations against interest . . . to be inapplicable to evidence of any *statement or portion of a statement not itself specifically disserving to the interests of the declarant. [Id.* at 441. Emphasis added.]

New York's highest court has also rejected the carry-over rule. See *People v Brensic,* 70 NY2d 9, 16; 517 NYS2d 120; 509 NE2d 1226 (1987):

If the court decides to allow such evidence [a statement against interest introduced to inculpate the accused], *it should admit only the portion of that statement which is opposed to the declarant's interest since the guarantee of reliability contained in declarations against penal interest exists only to the extent the statement is disserving to the declarant* . . . . [Emphasis added.][8]

[8] To the same effect is *State v Allen,* 139 NJ Super 285, 288; 353 A2d 546 (1976), which involved a hearsay statement sought to be introduced as exculpatory evidence by the defendant in a robbery case. In the disputed statement, the declarant admitted his own involvement in the robbery and named three accomplices, conspicuously leaving out the defendant. The court upheld the exclusion of the statement as follows:

The robbery delineated by the evidence was not committed by one felon; it involved three persons. As a consequence, the

Federal courts have also rejected the carry-over rule. In *United States v Lilley*, 581 F2d 182, 188 (CA 8, 1978), the court addressed the applicability of FRE 804(b)(3) to a statement that "contained some material which was against [the declarant's] interest and some allegations which were not against his interest and which were inculpatory of the accused." The court stated:

> The restriction advocated by McCormick excluding portions of statements which are not against the declarant's interest is in keeping with the reasoning behind the 804(b)(3) exception to the hearsay rule. Rule 804(b)(3) is based on the guaranty of trustworthiness which accompanies a statement against interest. To the extent that a statement is not against the declarant's interest, the guaranty of trustworthiness does not exist and that portion of the statement should be excluded. Those portions of [the declarant's] statement inculpating appellant did not so far tend to subject him to criminal liability and were not so far contrary to his interests that a reasonable man would not have made them unless he believed them to be true. . . . Thus, all portions of [the declarant's]

statement by [the declarant] that he committed the offense does not in itself exculpate defendant Allen. Although *that portion of the statement* would come within the [statement against interest] hearsay exception . . . , it would not be material on the issue of Allen's guilt. The presence of [the declarant], even if true, would not necessarily exclude the hypothesis of guilt of Allen.

*The remainder of the alleged statement referring to three other participants would not be admissible under [the statement against interest exception] because [the declarant's] reference to the involvement of others is clearly not against his own interest.* Similarly, his discussion relating to [one of the named confederates], his physical description and his involvement in the offense would be pure hearsay beyond the scope of any recognized exception. [*Id.* Emphasis added.]

Given the greater liberality in admitting exculpatory evidence, see n 9, *Allen*'s rejection of the carry-over rule even in that context provides especially strong support for rejecting it where, as here, the disputed statement is introduced to *inculpate* the defendant.

statement which were not against his interest should have been excluded from evidence because they lacked the indicia of truthfulness associated with Rule 804(b)(3). Also, the small portion of [the declarant's] statement which was against his interest should have been excluded absent severability from those portions of the statement inculpating the accused. [*Id.*]

Likewise, the United States Court of Appeals for the Fifth Circuit has held:

Given the advantages readily to be perceived in the incrimination of another for a crime in which the declarant himself is implicated, the circumstance that the inculpatory-against-the-accused statement would have probative value against the *declarant* does not necessarily indicate that, insofar as it implicates the *accused,* it is sufficiently against the declarant's interest so as to be reliable. [*United States v Sarmiento-Perez,* 633 F2d 1092, 1101-1102 (CA 5, 1981). Emphasis in original.]

Other cases rejecting the carry-over rule, at least implicitly, include *United States v Bailey,* 581 F2d 341, 345, n 4 (CA 3, 1978), *United States v Palumbo,* 639 F2d 123, 127-128 (CA 3, 1981), *United States v Riley,* 657 F2d 1377, 1384-1385 (CA 8, 1981), and *United States v Vernor,* 902 F2d 1182, 1187 (CA 5, 1990).

There are some cases, of course, which support the carry-over rule followed by the dissent, but such cases typically lack significant or persuasive explanation or analysis, and often arise in contexts not fully apposite to the instant case, such as hearsay statements introduced by an accused to *exculpate* himself. See, e.g., *State v Abrams,* 140 NJ Super 232, 235-236; 356 A2d 26 (1976), aff'd without opinion 72 NJ 342; 370 A2d 852 (1977) (following the carry-over rule in unpersuasive ipse

dixit in the context of a statement introduced by
the accused to exculpate himself);[9] *State v Earnest
(On Remand),* 106 NM 411, 412; 744 P2d 539 (1987)
(similarly unpersuasive ipse dixit applying the
carry-over rule with no analysis or justification).

Even if some form of carry-over rule were con-
ceded, arguendo, to be appropriate in some circum-
stances, the *overwhelming* weight of authority, in
both case law and treatises, emphatically rejects
any extension of such a rule to the special context
of accomplice confessions, given their uniquely
suspect and inherently unreliable character. In
this regard, it is appropriate to note that Dean
Wigmore's treatise, even if it could be read to
ambiguously support the carry-over rule to a lim-
ited extent, simply does not focus on the special
and unique problems raised by *accomplice confes-
sions used to inculpate the accused in a criminal
trial.*

Judge Weinstein's treatise does focus very infor-
matively on those problems and takes an almost
absolute position *against* the admission of inculpa-
tory hearsay statements in accomplice confes-
sions:[10]

---

[9] Although both MRE 804(b)(3) and its federal counterpart indicate
skepticism regarding the trustworthiness of statements against penal
interest "offered to exculpate the accused," by requiring in that
context that "corroborating circumstances clearly indicate the trust-
worthiness of the statement," pressures exist to exercise relatively
greater liberality in admitting exculpatory evidence, because of the
defendant's fundamental due process right (a right of somewhat
uncertain contours) to present any reliable exculpatory evidence. See,
e.g., *Green v Georgia,* 442 US 95; 99 S Ct 2150; 60 L Ed 2d 738 (1979);
*Chambers v Mississippi,* 410 US 284; 93 S Ct 1038; 35 L Ed 2d 297
(1973). As we note in n 14, most persuasive authorities favor applying
the "corroborating circumstances" requirement to any hearsay state-
ments offered to *inculpate* the accused as well.

[10] Judge Weinstein is less critical of the carry-over rule in his
general discussion of the statement against interest exception, as
applied to the full range of cases including civil litigation. See 4
Weinstein & Berger, Evidence, ¶ 804(b)(3)[02], p 804-138 (expressing
mild criticism of Professor Jefferson's stringent rejection of the carry-
over rule, see n 6, on the ground that "[e]xperience with our intelli-

*Statements Inculpating Accused.* Particularly troublesome is the problem of inculpating statements against penal interest inculpating the accused. Since they are offered against the accused, and by definition declarant is unavailable, confrontation questions arise. Since they are made by someone subject to criminal prosecution, the possibility exists, especially when the statement is made in police custody, that declarant is seeking immunity or hopes to be allowed to plead to a lesser crime, in return for his help to the prosecution in obtaining a conviction. Cross-examination in such instances is particularly important and is usually quite extensive. Generally, the defendant is entitled to a charge with respect to the particular care that needs to be taken in evaluating such accomplice testimony. [4 Weinstein & Berger, Evidence, ¶ 804(b)(3)[03], p 804-150.]

After discussing the rigorous inquiry that a trial court should always undertake in assessing an alleged statement against interest in an accom-

gent juries suggests that this view is too pessimistic"); see also *post,* p 689, n 17 (the dissent, citing this passage in Weinstein, while ignoring both its context and Weinstein's rigorous stance against admitting alleged statements against penal interest in the context of hearsay accusations in codefendant confessions introduced to inculpate the accused). We would disagree with the suggestion that "[t]here is no reason why, when admitting [a hearsay statement], the court should not explain to the jury the theory upon which this hearsay is being introduced so that it can evaluate more accurately the probative force of the disserving, neutral, and self-serving elements of the statement." 4 Weinstein & Berger, *supra.* This appears to suggest that the court might permit the jury itself to assess whether or not an alleged statement against interest (or portion thereof) is or is not, in fact, "disserving," "neutral," or "self-serving," and then to assess its "probative force" in that light. But the fundamental premise of evidence law is that the court alone, *not* the jury, decides threshold questions of admissibility. See, e.g., MRE 104(a). The jury cannot properly be permitted to "evaluate . . . the probative force" of a hearsay statement (or portion thereof) which is, in fact, "neutral" or "self-serving," because such a statement does not properly fall within the statement against interest exception in the first place. The jury should not be permitted to "evaluate" *any* hearsay statement under the statement against interest exception until and unless the *court* has determined that *that specific statement* is indeed intrinsically against the declarant's interest and therefore admissible.

plice confession offered to inculpate a criminal defendant, Judge Weinstein concludes that "[b]ecause of the dangers involved, exclusion should almost always result when a statement against penal interest is offered *against* an accused." *Id.* at 804-156 (emphasis in original); see also McCormick, Evidence (3d ed), § 279, pp 825-826.

That the carry-over rule cannot properly be applied in the context of codefendant confessions is abundantly clear from the United States Supreme Court's reasoning in *Lee v Illinois,* 476 US 530; 106 S Ct 2056; 90 L Ed 2d 514 (1986). The Court in *Lee* addressed the applicability of the Sixth Amendment right of confrontation to a hearsay codefendant confession, and stated:

> The true danger inherent in this type of hearsay is, in fact, its *selective reliability.* As we have consistently recognized, a codefendant's confession is presumptively unreliable *as to the passages detailing the defendant's conduct or culpability* because those passages may well be the product of the codefendant's desire to shift or spread blame, curry favor, avenge himself, or divert attention to another. [*Id.* at 545. Emphasis added.]

Clearly, *Lee* envisioned a careful and searching analysis of *each specific factual assertion* contained within any broader statement or confession. While *Lee* applied constitutional confrontation analysis, the very same concerns of reliability inform the proper analysis under hearsay evidence law.[11]

Clearly, the assumption behind the carry-over

[11] Other cases emphasizing the special duty of courts to carefully scrutinize purported statements against interest contained in accomplice confessions, where offered to inculpate the accused, include *Brensic,* 70 NY2d 14-16, *Standifur v State,* 64 Md App 570, 586-587; 497 A2d 1164 (1985), *State v Hoak,* 107 Idaho 742, 747-748; 692 P2d 1174 (1984), and *Sarmiento-Perez,* 633 F2d 1101-1104.

rule—that discrete self-serving or neutral asser-
tions within a broader statement somehow absorb
an aura of trustworthiness from separate asser-
tions which are against the declarant's interest—is
more than just inherently implausible as a general
matter, though it is that. In the context of accom-
plice confessions, that assumption simply flies in
the face of the obvious and long-recognized nature
of such confessions as *uniquely* and *especially*
suspect and unreliable with regard to accusations
directed toward alleged accomplices.

Given the inapplicability of any carry-over rule
to the confessions in this case, it is necessary to
separately analyze the specific accusatory state-
ments contained within them under MRE 804(b)(3).
At the outset, the general question arises of
how narrowly to divide such statements for analyt-
ical purposes. The answer is dictated by the logic
of the statement against interest exception, as
discussed above. Each factual assertion sought to
be admitted under that exception must be viewed
as narrowly and specifically as reasonably possible,
and the court must separately ask whether *each
specific assertion* is so intrinsically against the
declarant's interest that a reasonable person
would not have said it unless it were true. In other
words, to the extent such statements can be logi-
cally and reasonably severed and dealt with inde-
pendently, they should be. While this might, at
first glance, seem an arduous task, it becomes
quickly obvious that none of the accusatory state-
ments in the confessions at issue here can reason-
ably be said to be statements against interest.
Indeed, it appears likely, as a general matter, that
accusatory statements in codefendant confessions

will almost never properly qualify as statements against interest.[12]

While we have listed, in the appendix, sixty-five separate statements contained within the confessions at issue in this case, it is obvious that many of those numbered "statements" themselves contain several distinct and severable statements or assertions.[13] With all such assertions, the inquiry is analytically quite simple: Given everything else that the confessor admitted regarding his own participation in the alleged crimes, was it against his interest *also* to name and accuse the alleged

[12] The dissent's argument that our analysis of the specific alleged statements against interest in this case is "unconstitutional" under *Chambers v Mississippi,* n 9 *supra,* is without merit. See *post,* pp 702-703. In the first place, *Chambers* involved a criminal defendant's constitutional claim to introduce *exculpatory* hearsay evidence. Thus, the constitutional concern raised in *Chambers* could not possibly apply to a case, like this one, where the *prosecution* seeks to introduce *inculpatory* hearsay evidence. As we have already noted, see ns 8-9, it may well be, because of the very constitutional right enunciated in *Chambers,* that the relevant analysis would be more liberal with regard to admissibility where *exculpatory* rather than *inculpatory* evidence is involved. This would merely reflect our legal system's historic principle that it is better for ten guilty people to go free than for one innocent person to go to jail. We do not prejudge in any way the proper analysis in any hypothetical future case involving a hearsay statement against interest introduced to *exculpate* the accused.

Furthermore, even if our analysis had been applied to *Chambers* in its full rigor, the result in *Chambers* would not have been affected. The *specific* disputed hearsay statements in *Chambers,* unlike in this case, were not accusatory statements implicating accomplices, but rather were confessional statements directly and inseverably incriminating the declarant. They were also not made while in police custody, but rather were confided to "close acquaintance[s] shortly after the murder had occurred." See *Chambers,* 410 US 300. Finally, the dissent ignores the fact that the Court in *Chambers* placed significant reliance on the fact that the hearsay declarant was actually available for cross-examination at the trial. *Id.* at 301 and n 20.

[13] A "statement" for MRE 804(b)(3) purposes obviously cannot be defined in any superficial grammatical sense: for example, as a complete sentence. A single sentence might easily string together many separate (and perhaps completely unrelated) assertions or statements, some of which may be against interest, some neutral, and some blatantly self-serving. Only the first category can properly qualify under MRE 804(b)(3).

accomplices and describe their conduct? With regard to the accusatory statements in these confessions, the answer clearly is no. This conclusion is especially obvious with regard to statements such as no. 11 ("[Watkins] said come on, let's go beep [Wilbert]"), no. 24 (Answering question, "Did [Hunter] know what was going down?" stating, "Yes"), no. 45 ("[Phillips] told me to drive over on Cloverlawn because we were going on a mission"), and no. 62 ("[Hunter] is the boss and he would have had to order the hit or approve of it").

It might be argued that some of the statements refer collectively to both the confessor and one or more of the codefendants, and thus are simultaneously against the confessor's interest and inculpatory of the codefendants. But such an argument would fail to appreciate the easily severable nature of such statements. For example, in statements nos. 14-16, 45, 51, and 54, Jordan and Miller describe driving about in search of the intended victim, with each of them present in the car along with Watkins and Phillips. These statements were certainly against Jordan's and Miller's interest insofar as they admitted that they themselves were present in the car and that they were part of a group searching for an intended murder victim. But having admitted those facts, was it against either's interest to go further and specify either Watkins or Phillips as *also* being present in the car and participating in the scheme? Obviously not. The same logic applies to statements such as no. 22 ("Me and [Phillips] had Uzi's, [Watkins] had a .357 mag"). It was obviously against Jordan's interest to say that he had an Uzi, but it was clearly *not* against his interest to add that Phillips

also had an Uzi and that Watkins had a .357
magnum.[14]

In sum, the specific accusatory hearsay state-
ments at issue in this case are simply not state-
ments against interest. Having chosen to confess
their own involvement in the crime, Jordan and
Miller had nothing to lose by also accusing and
inculpating Watkins, Hunter, and Phillips. Indeed,
they probably felt they had plenty to gain. See
*post,* pp 657-664. In the end, however, it is unnec-
essary to speculate whether any particular addi-
tional circumstances rendered the hearsay state-
ments at issue *especially* untrustworthy. It is

___

[14] It is conceivable, of course, that a hypothetical codefendant
confession might contain an accusatory statement which is also
intrinsically and inseverably against the confessor's interest, even
analyzing the statement narrowly and separately. Cf. *Lee v Illinois,*
476 US 553, n 6 (Blackmun, J., joined by Burger, C.J., and Powell and
Rehnquist, JJ., dissenting) (arguing that certain inculpatory state-
ments in the codefendant confession in that case, in contrast to "the
typical confession implicating an accomplice," were "inseverabl[y]"
against the confessor's interest, while conceding that "[i]n most cases,
the inculpation of the accomplice is 'collateral' to the confession, in
that the allegations implicating the accomplice are not found in
portions of the statement directly adverse to the declarant's penal
interest"). No such statements appear in the confessions at issue in
this case, however. Moreover, even where a specific accusatory state-
ment is properly found to be intrinsically and inseverably against the
confessor's interest, most persuasive authorities hold that the propo-
nent of the statement must still surmount the *additional* hurdles of
demonstrating that the statement is sufficiently *strongly* and *predomi-
nantly* against the confessor's interest to dispel the inherently suspect
nature of such accusations, demonstrating the absence of custodial
circumstances typically rendering such accusations unreliable, and
producing corroboration at least as strong as (and perhaps stronger
than) that required by FRE 804(b)(3) and MRE 804(b)(3) with regard
to statements offered to *exculpate* the accused. See, e.g., 4 Weinstein
& Berger, Evidence, ¶ 804(b)(3)[03], pp 804-150 to 804-156; McCormick,
Evidence (3d ed), § 279, p 826; *Sarmiento-Perez,* 633 F2d 1098-1104;
*Brensic,* 70 NY2d 14-16. Again, however, because no statements of
this sort are implicated in this case, we need not exhaustively address
the standards which should govern their admissibility. A hearsay
statement in a codefendant confession which is not, on its face,
specifically and intrinsically against the confessor's interest, is inad-
missible under MRE 804(b)(3) without more, and no need exists in
that event to inquire further into any possible circumstantial indicia
of reliability.

enough to conclude, as the law and the facts clearly dictate, that they are simply not statements against interest under MRE 804(b)(3), that they therefore constitute inadmissible hearsay, and that their admission as evidence against Watkins, Hunter, and Phillips at trial was therefore erroneous.[15]

### B. THE RIGHT OF CONFRONTATION

The Sixth Amendment of the United States Constitution provides:

In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him . . . . [US Const, Am VI.]

The Michigan Constitution similarly provides:

In every criminal prosecution, the accused shall

---

[15] Because Jordan's and Miller's confessions, to the extent they do *not* inculpate or accuse Watkins, Hunter, or Phillips, are simply irrelevant to the guilt of the latter three, the confessions obviously should have been excluded altogether from their trial. It is well established, of course, that a jury cannot reasonably be expected to disregard an inculpatory codefendant confession simply on the basis of a cautionary instruction. See *Bruton v United States,* 391 US 123; 88 S Ct 1620; 20 L Ed 2d 476 (1968); *Cruz v New York,* 481 US 186; 107 S Ct 1714; 95 L Ed 2d 162 (1987). While the *Bruton* rule was enunciated in the context of constitutional confrontation concerns, it clearly applies with equal force to codefendant confessions that are inadmissible as a matter of hearsay evidence law. The introduction of inculpatory hearsay statements in codefendant confessions that do not properly fall within the statement against interest exception will always raise grave constitutional concerns. Thus, Watkins, Hunter, and Phillips should either have been tried separately from Jordan and Miller or the disputed confessions should have been redacted, if feasible, in a manner sufficient to satisfy evidentiary and constitutional concerns. This Court addressed the redaction issue in *People v Banks,* 438 Mich 408; 475 NW2d 769 (1991). The joint trial problem will not arise on remand in this case, of course, because this Court has denied Jordan's and Miller's applications for leave to appeal from the Court of Appeals affirmance of their convictions, and they, therefore, need not be retried.

have the right . . . to be confronted with the wit-
nesses against him . . . . [Const 1963, art 1, § 20.]

For more than a quarter century, the United
States Supreme Court, relying on the Sixth
Amendment right of confrontation, has subjected
hearsay statements in codefendant confessions in-
troduced to inculpate the accused to the most
searching and intensive scrutiny. In *Douglas v
Alabama,* 380 US 415; 85 S Ct 1074; 13 L Ed 2d
934 (1965), the Court held that the Sixth Amend-
ment was violated even though the hearsay accom-
plice confession was not formally admitted as evi-
dence, but was read to the codefendant as he
remained mute on the stand, claiming his Fifth
Amendment privilege against self-incrimination,
purportedly to "refresh" his memory. The Court
rejected that subterfuge and held that the defen-
dant was denied the right to confront and cross-
examine his codefendant accuser. See *id.* at 419-
420.

In *Bruton v United States,* 391 US 123; 88 S Ct
1620; 20 L Ed 2d 476 (1968), the Court held that
the danger posed by hearsay codefendant confes-
sions to the defendant's right of confrontation is so
extreme that cautionary instructions to the jury
regarding consideration of such evidence in joint
trials must be deemed ineffective and constitution-
ally insufficient. The Court stated:

   [T]here are some contexts in which the risk that
   the jury will not, or cannot, follow instructions is
   so great, and the consequences of failure so vital to
   the defendant, that the practical and human limi-
   tations of the jury system cannot be ignored. Such
   a context is presented here, where the powerfully
   incriminating extrajudicial statements of a co-
   defendant, who stands accused side-by-side with
   the defendant, are deliberately spread before the

jury in a joint trial. Not only are the incriminations devastating to the defendant but their credibility is inevitably suspect, a fact recognized when accomplices do take the stand and the jury is instructed to weigh their testimony carefully given the recognized motivation to shift blame onto others. The unreliability of such evidence is intolerably compounded when the alleged accomplice, as here, does not testify and cannot be tested by cross-examination. It was against such threats to a fair trial that the Confrontation Clause was directed. [*Id.* at 135-136. Citations omitted.]

The Court strongly reaffirmed *Bruton* in *Cruz v New York,* 481 US 186; 107 S Ct 1714; 95 L Ed 2d 162 (1987), which held that *Bruton*'s rejection of the efficacy of cautionary instructions applies even in cases where the complaining defendant himself has confessed, where his confession "interlocks" to a substantial extent with the accusatory hearsay confession of his codefendant, and where the codefendant's confession is no more inculpatory of the defendant than the defendant's own confession. See *id.* at 191-193.[16]

In the instant case, of course, there was no cautionary instruction or redaction with regard to the disputed accusatory statements in the codefendant confessions, because those statements were admitted as substantive evidence against the complaining defendants under MRE 804(b)(3). The issue here is simply whether such admission was proper.[17] The substantive inadmissibility of hear-

[16] On the same day that *Cruz* was decided, the Court addressed the efficacy of redacting codefendant confessions in joint trials to eliminate references to the name or existence of the complaining defendant. See *Richardson v Marsh,* 481 US 200; 107 S Ct 1702; 95 L Ed 2d 176 (1987). This Court addressed the redaction issue in *People v Banks,* n 15 *supra.*

[17] It is conceded in this case that the codefendant confessors were not available for confrontation because they chose to exercise their Fifth Amendment rights not to testify at trial. See *Douglas v Alabama, supra* at 419-420.

say codefendant confessions, while presumed in such cases as *Douglas* and *Bruton,* was squarely addressed by the United States Supreme Court in *Lee v Illinois, supra.*[18] The dissent concedes, as it must, that *Lee* is "[c]entral to our analysis" in this case, see *post,* p 693, but we must take issue with its understanding of *Lee* and its application of *Lee* to this case.

The Court in *Lee* squarely "reject[ed] [the state's] categorization of the hearsay [codefendant confession] involved . . . as a simple 'declaration against penal interest.' That concept defines too large a class for meaningful Confrontation Clause analysis. We decide this case as involving a confession by an accomplice which incriminates a criminal defendant." 476 US 544, n 5.[19] *Lee,* of course, did not thereby categorically bar the admission of

---

[18] The dissent notes that *Bruton,* which predated the general modern acceptance of statements against penal interest as falling within the statement against interest hearsay exception, observed that "[t]here is not before us . . . any recognized exception to the hearsay rule insofar as petitioner is concerned and we intimate no view whatever that such exceptions necessarily raise questions under the Confrontation Clause." *Bruton,* 391 US 128, n 3, quoted *post,* p 683. Far from suggesting that *Bruton*'s result might now be different in light of the statement-against-penal-interest exception, it is quite evident that this footnote dicta was meant merely to reassure the bench and bar that *Bruton*'s analysis did not necessarily extend to all hearsay introduced in criminal trials outside the narrow and specific context of codefendant confessions. In any event, the dissent's assertion that "[t]oday we have a hearsay exception that addresses the caveat left open in *Bruton,*" *post,* p 683, incorrectly suggests that the issue arguably left open by the cited footnote in *Bruton* has remained open to this day. It has not. As discussed in the text, *Lee,* postdating by a decade the general acceptance of statements against penal interest, squarely addressed the issue and provides clear guidance on it, guidance directly contradicting the reasoning and conclusion of the dissent.

[19] The dissent asserts that "[t]he *Lee* Court did not hold . . . that an inculpatory statement admitted under the penal interest exception violates the Confrontation Clause," *post,* p 695, n 26. But the Court in *Lee,* just as in this case, was presented with the argument that the codefendant confession there at issue was properly admissible in its entirety, as a statement against penal interest. Just as in this case, the codefendant confession in *Lee contained* separate and discrete statements, some of which were clearly against interest and some of

hearsay statements in codefendant confessions to inculpate the accused. But *Lee* did thereby reject the possibility that an accusatory hearsay statement in a codefendant confession, purportedly constituting a statement against interest, might on that ground be deemed *presumptively* admissible without any inquiry into its particularized guarantees of trustworthiness.

It is true that *Lee* avoided deciding whether, as a general matter, statements against penal interest fall within a "firmly rooted hearsay exception," but that is because the Court clearly found it *unnecessary* to decide that issue, because it would not have affected or altered the Court's analysis. (If the issue had been relevant or dispositive, the Court surely would have addressed it.) *Lee* focused specifically on the problems related to hearsay codefendant confessions introduced against the accused, and found that the "concept" of the statement against interest is simply too broad to be analytically useful (let alone dispositive) in that context. In part, footnote five in *Lee* appears to recognize that accusatory statements in codefendant confessions will not usually, in fact, truly constitute statements against interest. As discussed in part II(A), the Court's reasoning in *Lee* strongly suggests that it fully understood the carry-over issue and properly rejected any carry-over rule, at least in this context. Thus, the Court

which were clearly self-serving accusations directed at the codefendant. It would be a gross distortion of *Lee*'s holding to suggest that *Lee* ruled the confession inadmissible simply because it concluded that the confession was not, overall, a statement against interest. Rather, as we discuss and explain in the text, *Lee* rejected, as a theoretical matter, the *analytical usefulness* of categorizing such accomplice confessions as "statements against penal interest," even though that categorization might be *partially* accurate.

*Lee* did *not* "le[ave] open the situation that we are addressing today." *Post*, p 695, n 26. The situation presented here is fundamentally similar, for relevant analytical purposes, to that presented in *Lee*, and is closely and directly governed by *Lee*'s analysis.

may have thought the statement against interest exception "defines too large a class" because particular assertions within a statement generally against interest might not be specifically against interest themselves. See generally part II(A).

Footnote five in *Lee* clearly indicates much more, however, than that the Court might simply have found the particular statements at issue to be not truly against the confessor's interest. Rather, *as a general theoretical matter,* the Court stated that "[the] concept [of the statement against interest] defines too large a class for meaningful Confrontation Clause analysis," and concluded that it had to analyze the case more narrowly within the context of "a confession by an accomplice which incriminates a criminal defendant." 476 US 544, n 5. Indeed, the dissent in *Lee* argued strenuously that the hearsay statements inculpating the accused in that case truly were against the confessor's interest, even viewed narrowly and inseverably. See *id.* at 553, n 6 (Blackmun, J., joined by Burger, C.J., and Powell and Rehnquist, JJ., dissenting); cf. part II(A), n 14. It appears that the Court, while not necessarily rejecting that view of the statements, nevertheless believed that they had to be subjected to rigorous scrutiny regarding their "particularized guarantees of trustworthiness." Thus, the Court in *Lee* apparently believed that the statement against interest exception "defines too large a class" because, while that exception might confer presumptive reliability on most types of hearsay in most cases, it does not, without more, suffice to cure the especially suspect and uniquely unreliable nature of accusatory hearsay statements in codefendant confessions.

Indeed, central to any proper understanding of *Lee* is the recognition—as the Court painstakingly emphasized—that *Lee,* like the instant case, in-

volved hearsay that did not merely fall outside any traditional exception that would have conferred presumptive reliability on it. The hearsay in *Lee* did not merely lack, at face value, any *affirmative* indicia of reliability. Rather, because it constituted accusatory hearsay contained in a co-defendant confession, it was properly presumed at the outset to be *uniquely* and *especially* suspect and unreliable, much *more* so than typical, run-of-the-mill hearsay.

> Our cases recognize that th[e] truthfinding function of the Confrontation Clause is *uniquely* threatened when an accomplice's confession is sought to be introduced against a criminal defendant without the benefit of cross-examination. As has been noted, such a confession "is hearsay, subject to all the dangers of inaccuracy which characterize hearsay generally. . . . *More than this, however, the arrest statements of a codefendant have traditionally been viewed with special suspicion.* Due to his strong motivation to implicate the defendant and to exonerate himself, a codefendant's statements about what the defendant said or did are *less credible than ordinary hearsay evidence.*" [*Lee,* 476 US 541, quoting *Bruton,* 391 US 141 (White, J., dissenting) (citations omitted by *Lee*; emphasis added here).]

Thus, while *Lee* held that this "presumption [of unreliability] may be rebutted" in accordance with the general analysis of "particularized guarantees of trustworthiness" set forth in *Ohio v Roberts,* 448 US 56, 66; 100 S Ct 2531; 65 L Ed 2d 597 (1980), see *Lee,* 476 US 543, it is clear that the *Roberts* analysis should be conducted with much greater rigor in a *Lee*-type case. It is therefore not surprising that the Court's analysis of the disputed confession in *Lee* was constantly and explicitly sensitive to the special dangers of unreliability in that context. See *id.* at 544-546.

The dissent argues that the disputed hearsay statements in the instant case satisfy the test of reliability set forth in *Lee.* See *post,* pp 695-701. We discern eight separate grounds on which the dissent rests its finding that these statements bear sufficient particularized indicia of reliability: (1) the statements were voluntarily given, *id.* at 700, (2) none of the confessing codefendants was offered any " 'leniency in exchange' for their statements," *id.,* (3) the statements "were so far contrary to [the confessors'] penal interest that they had to be true," *id.* at 700, (4) the statements indicated "personal knowledge" of the underlying events, *id.* at 701, (5) the confessors confessed soon after their arrests, *id.,* (6) "there is nothing in the record to support an inference that either Jordan or Miller made the statements implicating the others in an attempt to avenge himself, or to demonstrate that he was motivated by a desire to curry favor with his interrogators, or that the state gave either any reason to believe that it would help if he inculpated others," *id.,* (7) there is "no affirmative evidence of blameshifting" in either Jordan's or Miller's confession, and both took a substantial helping of blame themselves, *id.* at 695, and (8) Jordan's and Miller's statements are "consistent" with, and therefore corroborate, each other, *id.* at 697, 701. Each of these grounds is addressed below, though not in order.

Ground 3 has already been refuted. The *accusatory statements contained in* these confessions are simply not, by any stretch of the imagination, statements against interest. See part II(A). Ground 1 was specifically rejected as inadequate by *Lee.* "[A] finding [of voluntariness] does not bear on the question of whether the confession was also free from any desire, motive, or impulse . . . either to mitigate [the confessor's] own culpability by

spreading the blame or to overstate [the accused's] involvement . . . ." 476 US 544. Hearsay accusations against codefendants are suspect precisely because the declarant is likely to make them not only voluntarily but *eagerly,* and because it will usually be in his own interest to do so.

Grounds 4 and 5 find no support in *Lee,* and plainly do not materially assist in overriding the presumption of unreliability. These factors would appear likely to exist with virtually every codefendant confession, and are thus unhelpful in singling out particularly reliable confessions. Virtually every codefendant confession is likely to suggest that the confessor has "personal knowledge" of the relevant events (if not, such statements would hardly be useful evidence for the prosecution), and most confessions, by definition, are taken in police custody soon after arrest. That a statement appears or purports to be based on "personal knowledge" says little or nothing about its potential inaccuracies or biases. The very danger and infirmity of all hearsay is precisely that the defendant has no opportunity to cross-examine the declarant regarding his alleged "personal knowledge," and regarding "the many possible deficiencies, suppressions, sources of error and untrustworthiness, which lie underneath the bare untested assertion of a [declarant] . . . ." 5 Wigmore, § 1362, p 3 (describing the underlying theory of the rule against hearsay). Furthermore, the fact that the confessions were taken in police custody soon after arrest has been universally viewed by all persuasive authorities as weighing heavily *against* the reliability of such statements. See, e.g., *Lee,* 476 US 541-542; 4 Weinstein & Berger, ¶ 804(b)(3)[03], p 804-154; McCormick, Evidence (3d ed), § 279, p 826; *Sarmiento-Perez,* 633 F2d 1102-1104; *Brensic,*

70 NY2d 15-16, 20. It is precisely in the context of
*custodial confessions made to police*—in contrast,
for example, to "a spontaneous declaration made
to friends and confederates," *Sarmiento-Perez,* 633
F2d 1102[20]—that the concerns regarding unreliable
codefendant accusations are at their zenith.

Grounds 2, 6, and 7 indicate an even more basic
flaw in the analysis of the dissent. By arguing that
this record reveals no explicit promises or offers of
deals by the police to these confessors, no affirma-
tive proof that these particular confessors were
*actually* motivated by a desire to avenge them-
selves, spread blame, or curry favor with the po-
lice, and "no affirmative evidence of blameshift-
ing," *post,* p 695, the dissent erroneously suggests
that accusatory codefendant confessions should
generally be admitted unless, on a case-by-case
basis, such specific evidence of unreliability is
produced. This turns *Lee* on its head. The very
premise of *Lee* is that accusatory statements in
codefendant confessions are, by their very nature,
*presumptively* unreliable, and that the mere *ab-
sence* of additional, specific indicia of unreliability
cannot suffice to overcome that heavy presump-
tion.[21] Even if the record in this or any case
reveals no explicit promises or inducements by the
police, it would depart from common sense to
suppose that these or any accomplice confessors
could be naïvely unaware of the fact, surely com-
mon knowledge "on the street," that benefits may
often be reaped by coöperating with the police and

[20] See also, e.g., *United States v Layton,* 855 F2d 1388, 1406 (CA 9,
1988) (involving a statement "uttered voluntarily to a trusted advi-
sor").

[21] As the dissent elsewhere acknowledges, see *post,* p 696, it is, of
course, the burden of the prosecution, as the proponent of the dis-
puted evidence, to disprove and overcome the heavy presumption of
unreliability cloaking such hearsay statements.

"naming names."[22] The controlling and persuasive authorities are in agreement that the motivation to spread the blame and curry favor with the police need not be affirmatively proven on a case-by-case basis, but rather must be *presumed to inhere* in the context of custodial confessions.

Thus, the ever-present *likelihood* that the police will try to induce statements inculpating suspected accomplices, and that, in any event, accomplice confessors will almost always desire to accuse and inculpate their alleged cohorts and will almost always believe (even without police encouragement) that they can help themselves by so doing,[23] provides a basis for *categorically* doubting the reliability of *all* custodial codefendant confes-

---

[22] The dissent, with the benefit of 20-20 hindsight and advanced legal training, finds this argument "remarkable." *Post,* p 700, n 31. We can only say that we find it perfectly predictable and unremarkable that a relatively uneducated layperson, under the stress and anxiety of custodial police interrogation, might (albeit mistakenly) think that he *might* possibly benefit from telling the police what they so clearly want to hear. We doubt that the police in such situations risk losing valuable voluntary confessions by pointing out to such confessors that, in fact, they may have nothing to gain.

[23] *Lee* referred to the "desire, motive, or impulse [the confessor] *may have had* either to mitigate the appearance of his own culpability by spreading the blame or to overstate [the accused's] involvement . . . ." 476 US 544 (emphasis added). The Court went on to observe that "[i]t *is worth noting* that the record indicates that [the confessor] *not only had a theoretical motive* to distort the facts to [the accused's] detriment, but that he *also* was actively considering the possibility of becoming her adversary . . . ." *Id.* (emphasis added). This language clearly indicates that the Court was simply "noting" the existence of further evidence that happened to support excluding the hearsay in *Lee,* not suggesting an evidentiary requirement for exclusion that must be satisfied in every case. It certainly does not suggest that the mere absence of such additional affirmative evidence of unreliability —in the instant case, the absence of evidence that the police explicitly sought to induce the confessors to inculpate their suspected accomplices—could overcome the heavy presumption of untrustworthiness. The Court noted that the record in *Lee* simply "document-[ed]" what it viewed as a general and ever-present "reality of the criminal process, namely, that once partners in a crime recognize that the 'jig is up,' they tend to lose any identity of interest and immediately become antagonists, rather than accomplices." *Id.* at 544-545.

sions.[24] This approach is consistent with the reasoning of the Court in *Cruz, supra,* which rejected the notion that the "devastating" effect of codefendant confessions noted by *Bruton* "should be assessed on a case-by-case basis. Rather, that factor was one of the justifications for excepting from the general rule *the entire category of codefendant confessions that implicate the defendant in the crime.*" 481 US 191 (emphasis added).

With regard to ground 7, it is not entirely clear what the dissent means by "affirmative evidence of blameshifting." *Post,* p 695. A confession is intrinsically suspect whenever, on its face, it imputes criminal liability to one or more accomplices by reporting or describing their alleged criminal conduct. To speak of "blameshifting," of course, implies that the confessor's accusations may be inaccurate or biased. But there is no way to tell, from the confession itself, whether the accusations are, in fact, true or false. It is entirely possible, in this as in any codefendant confession case, that the confessors' accusations are true and accurate. But the point of *Lee* and the general principles governing this area is that the hearsay character of such accusations precludes the vital probing and testing of confrontation and cross-examination, and that the context in which this kind of hearsay arises requires the *presumption* that such accusations are too unreliable to be properly admissible evi-

---

[24] See, e.g., McCormick, Evidence (3d ed), § 279, p 826 ("It has been held that the fact of custody alone, with its attendant *likelihood* of motivation by a desire to curry favor with the authorities, bars a finding that the statement was against interest and requires exclusion") (emphasis added); *Sarmiento-Perez,* 633 F2d 1102 (referring to motivation to curry favor, among others, as being among *"circumstances that inhere in the making of virtually every custodial confession"*) (emphasis added); *Brensic,* 70 NY2d 15 (in custodial questioning, "the declarant is *likely* to have a 'strong motive to falsify' in order to curry favor, shift blame, receive immunity from prosecution or obtain a favorable plea bargain") (emphasis added).

dence. That presumption cannot logically be over-
come simply because it *seems,* from the contents
or wording of the confession itself, that the confes-
sor is not shifting or spreading blame in an espe-
cially obvious or suspicious manner. A canny con-
fessor seeking to protect himself and shift blame
to others will obviously strive to make his confes-
sion *seem* as honest and free of "blameshifting" as
possible.

Ground 7 also erroneously suggests that the
mere fact that the confessor takes some helping of
blame himself renders his accusations of others
more reliable. At bottom, this amounts to no more
than a resurrection in disguised form of the in-
valid carry-over theory regarding statements
against interest. See generally part II(A). *Lee*
plainly rejected any notion that accusatory state-
ments in a codefendant confession are rendered
more reliable simply because the confessor also
inculpates himself (which is virtually always going
to be the case). The dissent in *Lee* noted that the
codefendant confessor in that case severely incul-
pated himself, indeed, that his "confession was less
favorable in all respects to his own interests than
[the complaining defendant's own] confession
. . . ." 476 US 553. Yet the Court in *Lee* still
found the accusatory statements intolerably unre-
liable, noting that "[t]he true danger inherent in
this type of hearsay is . . . its *selective* reliability.
. . . [A] codefendant's confession is presumptively
unreliable *as to the passages detailing the defen-
dant's conduct or culpability* . . . ." *Id.* at 545
(emphasis added).

Even if the analysis of the dissent with regard to
grounds 6 and 7 were theoretically proper, the
dissent misapplies that analysis by simply ignoring
the numerous statements in Jordan's and Miller's
confessions which, in fact, *do* pointedly shift and

spread blame onto the complaining defendants, minimize the confessors' own involvement, and suggest that the confessors were indeed motivated to inculpate the others in the hope of helping themselves. We have already noted the most dramatic of these statements: Jordan's declaration, at the very outset of his confession, that he was talking to the police "[*b*]*ecause I'm not going to take the fall alone*" (emphasis added). See, also, in the appendix, statements no. 23 (Jordan answering question, "Why did you guys want to kill [Wilbert]?" stating, "It was really [Watkins] who wanted him"), no. 42 (Miller, after many of the preparations for the crime had allegedly been completed by the others, claiming, "That's when I found out what was going down"), no. 62 (Miller answering question, "Who ordered [the hit]?" stating, "[Hunter] is the boss and he would have had to order the hit or approve of it"), no. 63 (Miller, in response to an open-ended question, volunteering statements that "[Hunter] was in the narcotics business," that Hunter "was an underboss enforcer for and body guard for" another drug boss, and that after the other drug boss got killed, "[Hunter] kind of took over [his] action"), and no. 65 (Miller answering question, "If a hit would be planned ahead of time, would you be informed of it?" stating, "No, that would be between [Hunter], [Phillips], and [Jordan], all I would do is drive, and I wouldn't find out until it was about to happen").

Indeed, the confessors in this case *frequently* attempted to shift responsibility *even for their own actions* onto the complaining defendants, by claiming, at various points, that they acted only in response to orders given by one or the other of the complaining defendants. See statements nos. 11, 27, 43-45, 51, 52, 54, and 62. Miller also denied participating in any of the actual shooting, and

denied knowing why the hit was ordered. In sum, we can only express puzzlement at the dissent's assertion that there is "no affirmative evidence of blameshifting" in these confessions. *Post,* p 695.

Finally, with regard to ground 8, the dissent errs in its reliance on the fact that Jordan's and Miller's confessions are "consistent" with each other. *Post,* pp 697, 701. In the first place, this observation misunderstands the "interlock" theory discussed in *Lee,* 476 US 545-546, and in *Cruz,* 481 US 193-194. The allegedly relevant consistencies in *Lee* and *Cruz* were between the codefendant's hearsay confession and *the complaining defendant's own confession.* In this case, Hunter and Phillips did not make any incriminating statements to the police, and Watkins' two statements were not introduced at trial. The interlock between Jordan's and Miller's confessions is far less significant in view of the fact that they had precisely the same presumptive motive to inculpate Watkins, Hunter, and Phillips.

In any event, the United States Supreme Court, just last year, squarely prohibited reliance on corroborative evidence of any kind in assessing whether presumptively unreliable hearsay bears sufficient "particularized guarantees of trustworthiness" for Confrontation Clause purposes. See *Idaho v Wright,* 497 US 805; 110 S Ct 3139; 111 L Ed 2d 638 (1990). *Wright* held that " 'particularized guarantees of trustworthiness' must be shown from the totality of the circumstances, but we think the relevant circumstances include only those that surround the making of the statement and that render the declarant particularly worthy of belief." 111 L Ed 2d 655. "To be admissible under the Confrontation Clause, hearsay evidence used to convict a defendant must possess indicia of reliability by virtue of its inher-

ent trustworthiness, not by reference to other evidence at trial." 111 L Ed 2d 657. The Court reasoned that

> the use of corroborating evidence to support a hearsay statement's "particularized guarantees of trustworthiness" would permit admission of a presumptively unreliable statement by bootstrapping on the trustworthiness of other evidence at trial, a result we think at odds with the requirement that hearsay evidence admitted under the Confrontation Clause be so trustworthy that cross-examination of the declarant would be of marginal utility. [*Id.*][25]

*Wright* specifically rejected reliance on either corroborative physical evidence, hearsay statements, or trial testimony, see 111 L Ed 2d 659, 664-665, and thus clearly overruled the dicta in both *Lee* and *Cruz* regarding reliance on the "interlocking" consistency or corroboration of confessions.[26]

---

[25] *Wright* does not conflict with the requirement in FRE 804(b)(3) and MRE 804(b)(3) of corroboration as a necessary condition of admitting a hearsay statement against penal interest where offered to *exculpate* a criminal defendant, a requirement that most persuasive authorities also apply to such statements where offered to *inculpate* a defendant. See part II(A), ns 9, 14. *Wright* simply holds, for Confrontation Clause purposes, that corroborative evidence can never be *sufficient,* even in part, to support the admission of presumptively unreliable hearsay—that is, that such evidence cannot weigh dispositively in favor of admission when the other indicia do not *already* support admission. The corroboration requirement of FRE 804(b)(3) and MRE 804(b)(3) simply imposes, as a matter of evidence law, an *additional* and *necessary* condition of admissibility in one narrow context. That is, even where a hearsay statement is shown to be truly against interest and to otherwise bear sufficient *inherent* indicia of reliability to be admissible, the *added* requirement of corroboration is imposed in that one narrow context. Thus, even if a given hearsay statement against interest were properly found constitutionally admissible under *Lee* and *Wright,* without consideration of corroborative evidence, it might still be found inadmissible under the governing hearsay analysis (whether state or federal) for lack of the necessary corroboration.

[26] Both the Court and the dissenting opinion in *Wright* were fully aware of the conflict with the *Lee* and *Cruz* dicta on this point. See

In sum, the admission of the accusatory hearsay statements in these confessions as evidence against Watkins, Hunter, and Phillips plainly violated their right of confrontation under both the United States and Michigan Constitutions. Not only were the statements not in any sense against interest, but, just as in *Lee,* they were "given in response to the questions of police, who . . . no doubt knew what they were looking for, and [they] w[ere] not tested in any manner by contemporaneous cross-examination by counsel, or its equivalent." *Lee,* 476 US 544. These statements suffer from the classic indicia of unreliability affecting virtually all custodial codefendant confessions. The heavy presumption of unreliability is not overcome by any particularized indicia of inherent trustworthiness, applying the proper analysis. To the extent that we may properly draw any particularized inferences about the motivations which may *actually* have prompted Jordan and Miller to make these statements, such inferences tend to support excluding rather than admitting them. Jordan explicitly, and Miller implicitly, made clear that their primary concern was "not to take the fall alone."

It may be that only a hearsay confessional statement strongly, specifically, and inseverably against the confessor's interest could ever conceivably qualify for admission under the test enunciated in *Lee,* and even then, the most rigorous and exacting scrutiny would be required to determine whether the prosecution has overcome the heavy presumption of unreliability. We agree with Judge

*Wright,* 111 L Ed 2d 657-658 and n * (opinion of the Court), 662-663 (Kennedy, J., joined by Rehnquist, C.J., and White and Blackmun, JJ., dissenting). It should be recalled that even in *Lee* the Court expressed considerable skepticism about the validity of the interlock theory, and, of course, found that it did not support the reliability of the disputed hearsay in that case. See *Lee,* 476 US 545-546.

Weinstein's wise counsel that "[b]ecause of the dangers involved, exclusion should almost always result when a statement against penal interest is offered *against* an accused." 4 Weinstein & Berger, Evidence, ¶ 804(b)(3)[03], p 804-156 (emphasis in original).

In this case both Michigan's rule against hearsay and the constitutional right of confrontation were plainly violated.

### C. HARMLESS ERROR

With regard to both evidentiary and constitutional errors, Michigan's harmless error rule requires that the appellate court be able to confidently conclude, beyond any reasonable doubt, that the error did not affect the jury's verdict. See *People v Robinson,* 386 Mich 551, 563; 194 NW2d 709 (1972). It is clear that the erroneous admission of Jordan's and Miller's confessions as evidence against the complaining defendants in this case— whether that error be deemed constitutional or merely evidentiary—cannot be deemed harmless with regard to either Watkins, Hunter, or Phillips. While the properly admitted evidence against these defendants was substantial, the hearsay confessions provided a uniquely devastating and detailed account of the alleged crime. Any doubt on this score is dispelled by the fact that the jury specially asked and was permitted to reëxamine copies of the two confessions during deliberation. It would be virtually impossible to find the error harmless in light of such a direct indication that the jury was specifically concerned with the erroneously admitted evidence.

For these reasons, these defendants' convictions must be reversed and remanded for retrial without the erroneously admitted codefendant confessions.

### III. CONCLUSION

The right of confrontation is not a hairsplitting technicality designed to needlessly hamper or impede the operation of our criminal justice system. It is a vital component of the Bill of Rights and the American tradition of justice, which serves not only the goal of protecting the liberty of presumptively innocent defendants—and thereby us all—but also, and inseparably so, the ultimate truth-seeking goal of the trial process itself. These goals are equally served by the exclusion of hearsay—an intrinsically suspect and presumptively unreliable form of evidence—unless it is properly found to fall within one of the established exceptions set forth in the Rules of Evidence.

We would reverse the judgment of the Court of Appeals and remand for retrial without the inadmissible hearsay.

LEVIN, J., concurred with CAVANAGH, C.J.

### APPENDIX

#### A. THE JORDAN CONFESSION

1. "[Watkins], another guy who worked for me came over to 9555 Pinehurst and said that Cliff was at home."

2. "Then me, [Miller], [Phillips] went in a black [C]ougar and drove over to Cliff's house. [Watkins] and another guy followed us in their car."

3. "We got the gun from Cliff and [Watkins] got in the car with us."

4. "[Watkins] said, 'I just saw [Payne] go to the store, we should get him.'"

5. "[Miller] and [Phillips] got out of the car with [Watkins]. They waited by the alley for [Payne] and brought him back to the car."

6. [Answering question, "Were they armed?"] "Yes, [Phillips] had an Uzi, [Watkins] had the gun we got from Cliff, [Miller] didn't have anything."

7. "When we got [Payne] to the car [Watkins] and [Phillips], no [Watkins] and [Miller] got in the back seat with him. They made him bend over and we went back to 9555 Pinehurst."

8. "We all went into the basement and they [apparently Watkins, Phillips, and Miller] questioned [Payne]. They were questioning him about a guy name[d] [Wilbert]."

9. "I went outside. Then [Hunter] came to the house. I told [Hunter] we got [Payne] in the basement and we went downstairs."

10. "[Payne] said I'll beep [apparently, contact by beeper] [Wilbert] because he didn't want us to kill him."

11. "[Watkins] said come on, let's go beep [Wilbert]."

12. "Me, [Phillips], [Miller], [Watkins] and [Payne] drove over to the Mendota and [Payne] beeped [Wilbert]."

13. "[Phillips] gave [Payne] an address off the top of his head on Cloverlawn and [Payne] gave it to [Wilbert]. [Hunter] was there with us."

14. "After we made the call, me, [Phillips], [Watkins], [Miller] and [Payne] went on Cloverlawn. At first we just drove down the street. We [saw] [Wilbert] parked near Tireman. He was pulling off and we were behind him."

15. "We [Jordan, Phillips, Watkins, Miller, and Payne] went back to Mendota and [Payne] beeped [Wilbert] again. I don't remember if [Hunter] was there or not."

16. "After [Payne] called, we went back on Cloverlawn, me, [Phillips], [Miller], [Watkins] and [Payne] and parked. We gave [Wilbert] another

address this time. Me, [Phillips], [Watkins], and [Payne] got out of the car. We told [Payne] to go and stand in front of the address we gave [Wilbert]."

17. "We waited about twenty or thirty minutes and decided to leave because it was raining a little bit and [Wilbert] had not showed up. We all got back into the car and started to leave and that's when we saw [Wilbert]."

18. "We came around the block and parked on the side street, I think it was Belton; but I'm not sure. Me, [Phillips] and [Watkins] got out."

19. "Me and [Phillips] went to one side of the street. [Watkins] was on the other. We were walking towards [Wilbert]. He was on [Watkins'] side of the street coming off the porch."

20. "[Wilbert] went to get in his car. That's when the shooting started."

21. "[Wilbert] took off in his car. We went back to our car and went back on Pinehurst. [Watkins] and [Payne] got out and we got out for a while. Then me, [Miller] and [Phillips] left."

22. [Answering question, "What kind of gun did you, (Watkins) and (Phillips) have?"] "Me and [Phillips] had Uzi's, [Watkins] had a .357 mag, the gun we got from Cliff."

23. [Answering question, "Why did you guys want to kill (Wilbert)?"] "Because [Payne] was working with us, then he quit us and was working for [Wilbert]. It was really [Watkins] who wanted him."

24. [Answering question, "Did (Hunter) know what was going down?"] "Yes."

25. [Answering question, "Are there any corrections (to the statement)?"] "Yes, when we picked up [Payne] [apparently referring to statement no. 5], [Watkins] stayed in the car, [Phillips] and

[Miller] got out. [Phillips] had the Uzi, [Miller] had the .357."

## B. THE MILLER CONFESSION

26. "On the day the shooting happened, [Watkins] came over to 9555 Pinehurst and said that Cliff wanted to give the gun [a .357 revolver] back to us."

27. "[Hunter] instructed us to get the gun."

28. "Me, [Phillips], [Jordan] went in a black [C]ougar, I think it's a 1979, over to Cliff's house."

29. "[Watkins] and a guy who I don't know got into a blue car and led the way to Cliff's."

30. "When we got to Cliff's he was on the porch, [Jordan] got the gun from him . . . . Before we left [Watkins] got out [of] the car he was in and got into our car. After we got the gun we left."

31. [Answering question, "Was anyone in the car armed before Cliff gave you the revolver?"] "Yes, [Jordan] had a Mack-10, [Phillips] had a[n] Uzi 9 mm, I was unarmed, and [Watkins] got the .357 from Cliff; but it wasn't loaded. The rest of the guns were loaded."

32. "We were just going around the block when [Watkins] spotted a gun [sic] who was walking out of a store. [Watkins] said, that's, then he said the guy's name; but I don't remember the name." [This was apparently Payne.]

33. "We turned the corner and pulled over. [Phillips] and me got out of the car and walked to an alley. [Phillips] got behind a garbage dumpster and I was in front of it."

34. "The guy who was walking [Payne] came across the street and started turning into the alley when I stopped him. I said don't move. The guy stopped and said don't kill me. [Phillips] jumped out and was standing behind me. I grabbed the

guy and walked him to the car and put him in the back seat with [Watkins], then I got in the back seat with him."

35. [Answering question, "Were either you or (Phillips) armed?"] "Yes, I had the .357, it was unloaded, [Phillips] had the Uzi."

36. "When we got [back to 9555 Pinehurst] [Phillips], [Jordan] and [Watkins] took [Payne] into the basement."

37. "[Hunter] was not at the house when we first arrived, either [Phillips] or [Jordan] went down the street, found [Hunter] and told him what had happened."

38. "[Hunter] then came back to the house with either [Phillips] or [Jordan] and went into the basement."

39. "Me, [Phillips] and [Hunter] were in one part of the basement talking about what happened. We [apparently Miller and Phillips] told him [apparently Hunter] about us going over there and getting the gun, and bringing [Payne] back with us."

40. [After Phillips, Jordan, Hunter, Watkins, and Payne had left 9555 Pinehurst] "I left 9555 Pinehurst and went over to Mendota where they were. When I got to Mendota I went up on the porch and [Phillips], [Jordan], [Hunter], [Watkins] and the other guy [Payne] sat on the porch talking about the guy who had beeped, all I remember is that the guy said he was waiting for someone to call him back."

41. "The guy finally called, when he called I was back on Pinehurst checking the house. I went back on Mendota and got the car and went and bought some gas and returned to Pinehurst. Everyone was there, [Phillips], [Hunter], [Jordan], [Watkins] and the other guy [Payne]."

42. "I parked the car and me, [Phillips], [Jordan] and [Hunter] just started walking down the street and talking. That's when I found out what was going down."

43. "[Hunter] told me to get into the car and drive to Mendota and Westfield with the guy [apparently Payne], and wait."

44. "I went back to Pinehurst, got the guy [Payne], put him in the car and went to where [Hunter] told me to go."

45. "[Phillips], [Jordan], and [Watkins] came and got into the car, [Phillips] told me to drive over on Cloverlawn because we were going on a mission and that we were going to meet the guy on Cloverlawn. I drove to Cloverlawn between Belton and Tireman, when we got there the guy who I took out of the Pinehurst house [Payne] pointed out a little red car and said that's them. They [sic] guy [apparently Wilbert] was coming off of the porch and was getting into his car, I speeded up to try to catch up with him, but he pulled off. He made a right on Tireman and circled the block. I tried to follow him but lost him. I caught back up with him on the sidestreet off of Tireman. I followed him and stopped on Brighton and Majestic."

46. "[Phillips], [Jordan] and [Watkins] got out of the car and started to walk up Majestic towards the red car."

47. "[Watkins] went into the alley. [Phillips] and [Jordan] stayed on the sidestreet. By the time they got there the guy was gone. They came back into the car and I tried to follow the guy; but I lost him."

48. "We went back on Mendota, [Phillips], [Jordan], [Watkins] and the other guy [Payne] went inside, I drove off and went and made a phone call."

49. "I went back to the house on Mendota, and stood on the porch. All of them came out, [Phillips], [Jordan], [Watkins], [Hunter] and the guy [Payne]."

50. "[Hunter] was mad. He didn't say anything but by knowing him I could tell he was mad."

51. "[Phillips] or [Jordan] said let's go and I got back in the car with [Phillips], [Jordan], [Watkins] and the other guy [apparently Payne]."

52. "[Phillips] told me to go back on Cloverlawn and that they called the guy [apparently Wilbert] again and had given him another address."

53. "While driving down Cloverlawn I saw the red car on Mackenzie, I made a left on Joy [R]oad, [Phillips], [Jordan] and [Watkins] were out of the car by this time. I dropped them off on Cloverlawn by the alley, I went into a lot on Northlawn and Joy Road, turned around then made a left on Joy [R]oad and picked all three of them up at Cloverlawn and Joy [R]oad."

54. "Once they [Phillips, Jordan, and Watkins] got into the car I drove to Roselawn and made a right, going back to Tireman, then another right on Belton. I cruised up to the alley with the lights off and stopped. [Phillips], [Jordan] and [Watkins] got out of the car and walked up to Cloverlawn. Before they got out either [Phillips] or [Jordan] told me to wait and that I was to crash into the red car if they tried to get away."

55. "As they [Phillips, Jordan, and Watkins] were walking away from our car I heard someone say, he turned around."

56. "I proceeded up Belton to Northlawn then to Mackenzie, turned and parked on the corner of Cloverlawn and Mackenzie. I saw the red car, it was like in the middle of the block. By the time I parked the shooting started."

57. "The red car pulled off, I realized that I wasn't where I was supposed to be and pulled off behind him. The red car made a left on Tireman, I stopped on Cloverlawn and Belton and picked up [Phillips], [Jordan] and [Watkins]. We tried to chase the car but he got away."

58. "We went back to the house, Wykes, that's where we followed him to earlier, but he wasn't there. Then we went back to Mendota, [Phillips], [Jordan], [Watkins] and the other guy [Payne] got out. I went and made another phone call and then went back to Mendota. Everyone was on the porch, [Phillips], [Jordan], [Watkins], [Hunter] and the other guy [Payne]. They took the car and told me to meet them back on Pinehurst. I walked back to Pinehurst, 9555, we all went inside and talked about what happened."

59. "Everyone was mad at me and blamed me for missing the guy. [Hunter] told me you better start learning how to think. The guy who I didn't know [apparently Payne] said you just signed my death warrant. We also discussed what to do with the guy who I didn't know [apparently Payne]. [Hunter] said to let him go. I left and went to my mother's house. Everyone was still on Pinehurst when I left."

60. [Answering question, "What type of weapons did the three guys have who did the shooting?"] "[Phillips] and [Jordan] had Uzi's, [Watkins] had the .357."

61. [Answering question, "Who loaded the .357?"] "I don't know but before [Watkins] left the car he checked it and said it was loaded."

62. [Answering question, "Who ordered (the hit)?"] "[Hunter] is the boss and he would have had to order the hit or approve of it."

63. [Answering question, "What relationship be-

tween you, (Phillips), (Jordan), (Watkins) and (Hunter)?"] "Me, [Phillips] and [Hunter] grew up knowing each other. I met [Jordan] after I got with the crew and that's also when I met [Watkins]. [Hunter] was in the narcotics business. He was an underboss enforcer for and body guard for Farmer, he's the guy who got killed on the expressway, Wendell Henry. After he got killed, [Hunter] kind of took over Farmer's action, he was still working for someone, but I don't know who. Me, [Phillips], [Jordan], were the enforcers for [Hunter]. An enforcer is a person who makes sure everything is going all right, and who straightens things out if there [sic] not."

64. [Answering question, "Do you know what happened to the guns that were used?"] "They were kept by the guys who had them."

65. [Answering question, "Are there any additions or corrections you want made?"] "The only other thing is that it was not a planned hit for that day, we were only supposed to get the gun, the rest just happened afterwards." [Answering question, "If a hit would be planned ahead of time, would you be informed of it?"] "No, that would be between [Hunter], [Phillips], and [Jordan], all I would do is drive, and I wouldn't find out until it was about to happen."

BRICKLEY, J. (*concurring*). Few situations in criminal law generate more troubling and thorny issues than the substantive admissibility of an accomplice's custodial confession against a codefendant. The United States Supreme Court has long recognized the hazards exposed to the right of confrontation in cases where the state seeks to admit a nontestifying codefendant's confession. *Bruton v United States,* 391 US 123; 88 S Ct 1620; 20 L Ed 2d 476 (1968).

I agree with the result reached by the Chief Justice that the trial court erroneously allowed admission of the codefendant's confessions under the facts presented, and that the error was not harmless. The Chief Justice's position that the statement against interest hearsay exception is not based on the circumstances surrounding the giving of the statement, but on its contents and therefore admissibility should be limited to only those statements contrary to the declarant's penal interest has considerable logic. However, because the parties did not raise this particular issue in the lower courts, the defendants did not raise it on appeal, and the prosecutor raised the issue only in a footnote on the last page of his brief, I decline to endorse the Chief Justice's reasoning regarding the so-called carry-over rule in the context of declarations against penal interest. The lead opinion predicts all too accurately that "as a general matter, . . . accusatory statements in codefendant confessions will almost never properly qualify as statements against interest." *Ante,* pp 646-647. I would leave this issue open for another day.

I respectfully cannot agree with the dissent that the confessions at issue "bear the particular guarantees of trustworthiness required by the Sixth Amendment." (*Post,* p 701.) The reliability of the confession of Jordan is powerfully undercut by his opening statement in reply to the question of why he was making a statement that he would not "take the fall alone." Miller's confession appears even less reliable than Jordan's in that it minimizes Miller's involvement in the criminal transaction and maximizes the affirmatively bad acts of his codefendants.[1] Furthermore, unlike *United*

[1] Indeed, it is conceivable from the text of Miller's statement that he may not have even realized he was uttering a statement against interest or confessing to criminal acts given a layperson's likely misapprehension of the intricacies of accomplice liability.

*States v Layton,* 855 F2d 1388, 1402 (CA 9, 1988), this case involves *a custodial confession,* not a noncustodial statement against interest made to a trusted adviser.[2] Thus, both the circumstances surrounding the statements and the substance of the statements themselves mitigate against their admissibility, even without considering that codefendant confessions are presumptively unreliable and that the statement against interest exception has not been conclusively validated as a "firmly rooted" hearsay exception.

As in *Lee v Illinois,* 476 US 530; 106 S Ct 2056; 90 L Ed 2d 514 (1986), I would conclude that both the circumstances and the substance of these confessions indicate an unacceptable basis of reliability for Confrontation Clause purposes. For these reasons, I support the result, although not the entire reasoning of the Chief Justice's opinion.

Griffin, J., concurred with Brickley, J.

Riley, J. (*dissenting*). In the instant case, we are asked to consider whether the trial court erred by permitting the prosecutor to introduce as substantive evidence incriminating statements of two nontestifying codefendants at the defendants' joint trial and, if so, whether the error was harmless. While the lead opinion reasons that the trial court erred in admitting the statements because they were not against the declarants' penal interest,[1] I would hold that the introduction of the nontestifying declarants' unredacted statements that impli-

---

[2] Similarly, it cannot be said, under the *Layton* factors that these confessions were "made contemporaneously with the occurrence of the events [which they] reference[ ]" or that the "statement[s] [were] uttered spontaneously," or that "the person to whom the statement was made [was] someone to whom the declarant would likely speak truthfully." (*Post,* p 699.)

[1] Two justices concurred in result, but not in reasoning.

cated the defendants was not error, and consequently did not violate the Confrontation Clause of either Const 1963, art 1, § 20 or US Const, Am VI. Thus, I would affirm the decision of the Court of Appeals.[2]

I

It was established at trial that on August 26, 1986, Michael Hunter sent Christian Phillips, Walter Miller, Donald Watkins, and Kerry Jordan to the home of Cliff Harris to retrieve a gun given to Harris by Hunter. Harris, who once sold cocaine for Hunter, used the gun to protect himself and the crack house out of which he worked. Having learned that the four were coming, Harris asked a friend, Bernard Payne, to "watch his back" while the return of the gun took place.

Payne agreed and waited with Harris for the arrival of Hunter's men. However, before the four men arrived to retrieve the gun, Payne decided to leave the house and walk to the local grocery store. While walking back to Harris' house, Watkins, Miller, and Jordan accosted Payne and forced him at gunpoint into an awaiting automobile driven by Phillips. The four took Payne to a house on Pinehurst in Detroit to meet Hunter. Hunter told Payne to page his friend, Desmond Wilbert, who had also sold cocaine for Hunter, and to direct Wilbert to pick him up at an address on Cloverlawn in Detroit. He made it clear to Payne that he was not interested in harming him, but wanted Wilbert killed because he had heard that Wilbert was selling cocaine in direct competition with him on the west side of Detroit.

Payne did as he was ordered, and all the men, except Hunter, left to await Wilbert's arrival.

[2] 178 Mich App 439; 444 NW2d 201 (1989).

They missed their first opportunity to intercept
Wilbert because he drove off before they could get
out of the car and shoot him. After returning to
their house, Hunter directed Payne to page Wil-
bert again and arrange a second pickup at the
Cloverlawn address. When Wilbert returned to
that address, Phillips, Watkins, and Jordan (sta-
tioned with two on one side of the street and one
on the other) opened fire. Wilbert was able to
escape in the car and survive the attack, but a
sixteen-year-old passenger, Voncie Johnson, was
killed.

A few months later, all five defendants were
apprehended for the murder of Voncie Johnson,
the attempted murder of Desmond Wilbert, and
the kidnapping of Bernard Payne. When ques-
tioned by the police, Jordan, Miller, and Watkins
implicated themselves and the others in the crimi-
nal episode.[3] Jordan and Miller told the police that
they and the others were ordered by Hunter to kill
Wilbert and that is what they attempted to do.[4]
Neither attempted to deny involvement in the
shooting, and neither tried to blame anyone other
than himself, or the other defendants for the
killing.

Before trial, Jordan and Miller moved to sup-
press their statements. Both claimed the police
promised them leniency in exchange for implicat-
ing the other members of the group. Judge Henry
Heading of the Detroit Recorder's Court took testi-
mony from Jordan, Miller, and the homicide detec-
tive who obtained the statements and concluded
that both the declarants spoke freely to the police

[3] Watkins' two statements were not introduced at trial because the
prosecutor deemed them inconsistent and designed to shift blame.
The prosecutor did, however, read the statements into the record for
our benefit to demonstrate his discretion in not offering them to the
jury for their review.

[4] See appendices A and B.

and that no promises or threats occurred, and denied their motion to suppress.[5]

At trial, the testimony of Payne and Harris implicated all five of the defendants in the murder of Voncie Johnson, the attempted murder of Desmond Wilbert, and the kidnapping of Bernard Payne. Their testimony was corroborated by a host of witnesses involved in the investigation.[6] None of the defendants testified on their own behalf.

Toward the conclusion of his case, the prosecutor moved for the admission of Jordan's and Miller's statements under MRE 804(b)(3). In a hearing conducted outside the presence of the jury, Judge Michael Talbot of the Detroit Recorder's Court, reviewed the statements in light of the relevant case law and held that Jordan's and Miller's statements could be introduced under the hearsay exception for declarations against penal interest. He reasoned that the statements had "greater reliability than any other exception to the hearsay rule by the very nature [of] admitting to the crime . . . ." After both statements were read to the jury, and before closing arguments, Judge Talbot instructed the panel to disregard the opinion testimony made in the statements and to concentrate only on the testimony that related to the substantive matter.

During the course of deliberations, the jury asked the court if they could listen to the testimony of Bernard Payne one more time, and review Jordan's and Miller's statements. In complying with the second request, Judge Talbot instructed the prosecutor to "redact" or "white-out" "any

[5] The Court of Appeals reviewed Jordan's and Miller's claim that the statements were involuntarily given. After independently reviewing the record, the Court of Appeals concluded that the trial court did not err in finding that the statements were voluntarily given. *People v Watkins, supra* at 447-448.

[6] Desmond Wilbert testified that he did not recognize his assailants.

opinion testimony" in the statements so that the jury would adhere to his prior instruction to disregard any opinion testimony in the statements. After reviewing the redacted materials, counsel for the defense informed the court that they had no objection to permitting the jury to consider the redacted statements.[7]

The jury unanimously convicted all five defendants for the stated charges after rehearing the testimony of Payne and examining the redacted statements of Miller and Jordan.[8]

The Court of Appeals affirmed their convictions, finding that no error was committed by the trial court in admitting the codefendants' statements as substantive evidence because the statements bore a sufficient amount of trustworthiness to overcome the presumption of unreliability. *People v Watkins, supra* at 445-447. We granted leave to appeal to determine whether the trial court erred in permitting the prosecution to introduce, as substantive evidence at the defendants' joint trial, incriminating statements of two nontestifying codefendants, and if so, whether the error was harmless.[9]

---

[7] The record does not contain a copy of the redacted statements.

[8] Defendants Phillips, Jordan, Miller, and Watkins were convicted of first-degree murder, MCL 750.316; MSA 28.548, assault with intent to commit murder, MCL 750.83; MSA 28.278, kidnapping, MCL 750.349; MSA 28.581, and possession of a firearm during the commission of a felony, MCL 750.227b; MSA 28.424(2). Defendant Hunter was also convicted of first-degree murder and assault with intent to commit murder. Phillips, Miller, and Watkins were sentenced to mandatory life on the murder convictions, life imprisonment on the assault convictions, 30-60 years for the kidnapping convictions, and the mandatory two-year term of imprisonment for the felony-firearm sentences. Defendant Jordan was sentenced to natural life for the murder conviction, life for the assault conviction, 25-50 years for kidnapping, plus the mandatory two-year term for possession of a firearm during the commission of a felony. Defendant Hunter was sentenced to life imprisonment for the murder conviction, and to a term of imprisonment of 50-100 years for the assault conviction.

[9] 435 Mich 867 (1990). We, however, denied defendants Jordan's and

II

The defendants have argued throughout the appellate process that, as a general rule, the Confrontation Clause does not permit the use of a nontestifying codefendant's incriminating statement to be used substantively against a codefendant. In support of this argument, they rely on *Bruton v United States,* 391 US 123; 88 S Ct 1620; 20 L Ed 2d 476 (1968). In *Bruton,* the incriminating written statement of an accomplice was read to the jury after the accomplice invoked his privilege against self-incrimination and refused to testify. The United States Supreme Court reversed the accused's conviction, holding that the Confrontation Clause bars the use of a nontestifying codefendant's statement which implicates the accused in a crime. However, the Court added the caveat that "[t]here is not before us . . . any recognized exception to the hearsay rule insofar as petitioner is concerned and we intimate no view whatever that such exceptions necessarily raise questions under the Confrontation Clause." *Id.* at 128, n 3.[10]

Today we have a hearsay exception that addresses the caveat left open in *Bruton.* MRE 804(b)(3),[11] and its federal counterpart FRE 804(b)(3), codify the common-law exception to the hearsay

Miller's applications for leave to appeal. Orders of the Supreme Court, entered July 18, 1990 (Docket Nos. 86852 and 87090).

[10] The lead opinion incorrectly characterizes my statement as an attempt to infer that *Bruton* has been undercut or overruled by the subsequent "general acceptance of statements against penal interest . . . ." See *ante,* p 653, n 18. In *Bruton,* the Court assumed the inadmissibility, against the accused, of the implicating confession of his codefendant and centered upon the effectiveness of a limiting instruction, a question not at issue here.

[11] MRE 804 provides in part:

(b) *Hearsay exceptions.* The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:

rule for statements against penal interest. See 4 Weinstein & Berger, Evidence, ¶ 804(b)(3)[01], p 804-123.

This exception to the hearsay rules is based on the premise that "[t]he circumstantial guaranty of reliability for declarations against interest is the assumption that persons do not make statements which are damaging to themselves unless satisfied for good reason that they are true." See Notes of the Advisory Committee, as reported in 11 Moore, Federal Practice, § 804.01[12—6]. See also Weissenberger, Federal Evidence, § 804.20, p 512; 4 Weinstein & Berger, Evidence, ¶ 804(b)(3)[01], p 804-123; Lilly, Introduction to Evidence, p 261.

The rule expressly provides that a statement is not admissible if offered to exculpate the accused, unless corroborating circumstances clearly indicate the trustworthiness of the statement. However, it does not offer express guidance relative to when a statement is offered to inculpate the accused. See Notes of the Senate Committee on the Judiciary, as reprinted in 11 Moore, Federal Practice, § 804.01[12—3].

When this rule of evidence was being considered by Congress, the House Subcommittee on the Judiciary added an additional sentence that would have prohibited the use of an against penal interest statement that inculpated a codefendant. See

* * *

(3) *Statement against interest.* A statement which was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject him to civil or criminal liability, or to render invalid a claim by him against another, that a reasonable person in his position would not have made the statement unless he believed it to be true. A statement tending to expose the declarant to criminal liability and offered to exculpate the accused is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement.

Notes of the House Committee on the Judiciary, reprinted in 11 Moore, Federal Practice, § 804.01[12—1]. However, the Senate Committee on the Judiciary deleted the House amendment because

> the basic approach of the rules is to avoid codifying, or attempting to codify, constitutional evidentiary principles, such as the fifth amendment's right against self-incrimination and, here, the sixth amendment's right of confrontation. Codification of a constitutional principle is unnecessary and, where the principle is under development, often unwise. Furthermore, the House provision does not appear to recognize the exceptions to the *Bruton* rule, e.g., where the codefendant takes the stand and is subject to cross examination; where the accused confessed, see *United States v Mancusi,* 404 F2d 296 (CA 2, 1968), cert den 397 US 942 [1970]; where the accused was placed at the scene of the crime, see *United States v Zelker,* 452 F2d 1009 (CA 2, 1971). [11 Moore, Federal Practice, § 804.01(12—3).]

The conference committee adopted the Senate version, omitting the House amendment, and justified its resolution with the reasoning employed by the Senate Committee: the rules of evidence should not attempt to codify constitutional principles on this issue. 11 Moore, Federal Practice, § 804.01[12—4]. Accordingly, the drafters of the rule left to the courts the task of delineating prerequisites to the admissibility of inculpatory penal interest statements.

Before the adoption of the rules, commentators had almost universally disapproved the reluctance to admit declarations against penal interest. Dean Wigmore, who is regarded as the leading authority on the law of evidence, denounced the economic limitations on the declarations against interest exception as "arbitrary," "illogical," "barbarous,"

and contrary to two hundred years of precedents.[12]
5 Wigmore, §§ 1476, 1477, pp 349-362.

Professor Morgan, a leading authority on the
law of evidence,[13] concluded that excluding declara-
tions against penal interest while admitting decla-
rations against economic interest does not have
"even a superficial appearance of rational
consistency . . . ." Morgan, *Declarations against
interest*, 5 Vand L R 451, 463 (1952).

Moreover, Professor McCormick, another distin-
guished commentator on the law of evidence,
agreed with Wigmore that the exclusion of the
penal interest doctrine was not justified in law or
in any other manner. Far from taking a "firm
position" against Wigmore's position regarding the
hearsay exception admitting declarations against
penal interest, *Professor McCormick unequivocally
endorsed the arguments raised by Dean Wigmore
in § 278 of his classic and very persuasive treatise
on the law of evidence.*

> Was the practice of excluding third-person con-
> fessions in criminal cases justified? *It certainly
> could not be justified on the ground that an ac-
> knowledgment of facts rendering one liable to
> criminal punishment was less trustworthy than an
> acknowledgment of a debt.* The motivation for the
> exclusion has no doubt been a different one,
> namely, the fear of opening a door to a flood of
> witnesses testifying falsely to confessions that
> were never made or testifying truthfully to confes-
> sions that were false. This fear was based on the
> likely criminal character of witness and declarant,

[12] Although Dean Wigmore's reasoning has not been endorsed by all
courts and commentators, the lead opinion's criticism of his reasoning
pertaining to the carry-over issue is unfounded. See *ante*, p 635, n 5.

[13] Professor Morgan was the Frank C. Rand Professor of Law at
Vanderbilt University, the Royal Professor of Law Emeritus and
former Acting Dean of Harvard Law School, Reporter for the A.L.I.
Code of Evidence, and author of numerous articles on evidence and
related subjects.

reinforced by the requirement that declarant be unavailable. Wigmore rejects the argument of the danger of perjury since the danger is one that attends all human testimony, and concludes that "any rule which hampers an honest man in exonerating himself is a bad rule, even if it also hampers a villain in falsely passing for an innocent." Under this banner, saluted also by Holmes, J., in a famous dissent, courts began to relax the rule of exclusion of declarations against penal interest in particular situations or generally. [McCormick, Evidence (3d ed), § 278, p 823. See also the same treatise and section in the second edition (1972). Emphasis added.]

Equally important were the state and federal court decisions that relaxed the requirements of excluding penal interest statements before the rules of evidence incorporated the penal interest hearsay exception. This trend began with Justice Oliver Wendell Holmes who, though in dissent, argued:

The rules of evidence in the main are based on experience, logic and common sense, less hampered by history than some parts of the substantive law. There is no decision by this court against the admissibility of such a confession; the English cases since the separation of the two countries do not bind us; the exception to the hearsay rule in the case of declarations against interest is well known; *no other statement is so much against interest as a confession of murder,* it is far more calculated to convince than dying declarations, which would be let in to hang a man, *Mattox v United States,* 146 US 140 [13 S Ct 50; 36 L Ed 917 (1892)]; and when we surround the accused with so many safeguards, some of which seem to me excessive, I think we ought to give him the benefit of a fact that, if proved, commonly would have such weight. The history of the law and the arguments against the English doctrine are so well and fully

stated by Mr. Wigmore that there is no need to set them forth at greater length. 2 Wigmore, Evidence, §§ 1476, 1477. [*Donnelly v United States,* 228 US 243, 277-278; 33 S Ct 449; 56 L Ed 820 (1913) (Holmes, J., dissenting). Emphasis added.]

Given the strength of Justice Holmes' analysis, several state courts began to relax their evidentiary rules excluding the declaration against interest in particular situations,[14] or generally.[15] See McCormick, *supra,* § 278, p 823.[16] For example, in rejecting the exclusion of a declaration against penal interest, the California Supreme Court reasoned that

a person's interest against being criminally implicated gives reasonable assurance of the veracity of his statement made against that interest. Moreover, since the conviction of a crime ordinarily entails economic loss, the traditional concept of a "pecuniary interest" could logically include one's "penal interest." (Compare the theory that admits a third person's confession of a crime on the ground that the crime was also a tort, thus subjecting the declarant to civil liability for damages, a pecuniary interest. E.g., *Weber v Chicago, R I & P R Co,* 175 Iowa 358 [376-377]; [151 NW 852, 864 (1915); L.R.A. 1918A, 926]; McCormick, *supra,* § 255, p 549.) [*People v Spriggs,* 60 Cal 2d 868, 874-

[14] *People v Lettrich,* 413 Ill 172; 108 NE2d 488 (1952); *Brady v State,* 226 Md 422; 174 A2d 167 (1961); *Hines v Commonwealth,* 136 Va 728; 117 SE 843 (1923).

[15] *People v Spriggs,* 60 Cal 2d 868; 36 Cal Rptr 841; 389 P2d 377 (1964); People v Brown, 26 NY2d 88; 308 NYS2d 825; 257 NE2d 16 (1970).

[16] It is noteworthy to mention that before the adoption of the rules of evidence, six states, through judicial opinions, adopted the rule without legislative authorization. *Deike v Great Atlantic & Pacific Tea Co,* 3 Ariz App 430, 432-433; 415 P2d 145 (1966); *State v Leong,* 51 Hawaii 581; 465 P2d 560 (1970); *State v Higginbotham,* 298 Minn 1, 4-5; 212 NW2d 881 (1973); *Sutter v Easterly,* 354 Mo 282, 289, 295-296; 189 SW2d 284 (1945); *People v Brown,* n 15 supra; *Howard v Jessup,* 519 P2d 913, 917 (Okla, 1973).

875; 36 Cal Rptr 841; 389 P2d 377 (1964) (en banc).]

It is evident that both courts and commentators agreed that the arbitrary limitation of excluding penal interest statements was unfounded in reasoning and unjustified in law.[17] Conflicting opinions have emerged regarding how MRE 804(b)(3) ought to be applied to inculpatory statements. The lead opinion takes the narrow position that

> [e]ach factual assertion sought to be admitted under that exception [MRE 804(b)(3)] must be viewed as narrowly and specifically as reasonably possible, and the court must separately ask whether *each specific assertion* is so intrinsically against the declarant's interest that a reasonable person would not have said it unless it were true. [*Ante,* p 646.]

However, I believe that the lead opinion's proposal to exclude all collateral statements does not reach a satisfactory conclusion to the "inculpatory" problem of MRE 804(b)(3). The legislative history of the rule, as previously discussed, persuasively illustrates that the drafters did not intend MRE 804(b)(3)

---

[17] It is not my position that all commentators have disagreed with the argument urged by the dissent. Professor Bernard Jefferson has written a law review article arguing that Wigmore and the drafters of the Model Rules of Evidence are incorrect in suggesting that a declaration against penal interest involves a truth-telling frame of mind that carries over to statements other than those against interest. Jefferson, *Declarations against interest: An exception to the hearsay rule,* 58 Harv L R 1, 63 (1944).

I find Professor Jefferson's argument, and the lead opinion's reliance on it, unpersuasive. In my opinion, Judge Weinstein correctly concluded that, "[e]xperience with our intelligent juries suggests that this view is too pessimistic." 4 Weinstein & Berger, Evidence, ¶ 804(b)(3)[02], p 804-138. Indeed, after a trial judge examines a statement to determine its reliability and trustworthiness, there is no reason why, when admitting the statement, "the court should not explain to the jury the theory upon which this hearsay is being introduced so that it can evaluate more accurately the probative force of the disserving, neutral, and self-serving elements of the statement." *Id.*

to be meaningless in its application with regard to inculpatory statements. Under my colleagues' approach, the only function the rule would have is to permit the introductions of admissions, an element already covered by MRE 801(d)(2).[18] This blanket exclusion would deprive the rule of much of its force because a large number of exculpatory statements are collateral.

I believe that inculpatory statements should be admitted under MRE 804(b)(3) if they withstand an examination of the trustworthiness of the statements at the time of their making. This means the proponent would have to show that the statement directly implicates the declarant in the crime. In addition, the proponent of the statement would have to show that the collateral portion is so closely related in time and context to the disserving portion that it is equally trustworthy.

Under the foregoing principle, Jordan's and Miller's statements were, in my opinion, properly admitted under MRE 804(b)(3) as declarations against their own penal interest. Kerry Jordan admitted being involved in the entire incident.[19] He detailed his and the codefendants' involvement in the murder of Johnson and acknowledged his role of firing shots from a machine gun at Desmond Wilbert's vehicle. None of the descriptions of the involvement of others in the events in any way shifted Jordan's responsibility for his actions. Un-

---

[18] I do not agree with my colleagues' argument that, under their narrow analysis, an inculpatory statement could be admitted under MRE 804(b)(3) if the statement "is also intrinsically and inseverably against the confessor's interest, even analyzing the statement narrowly and separately." *Ante,* p 649, n 14. My colleagues have not persuasively established a factual, or hypothetical, situation where such a statement could be entered under the rule. The only conclusion I can draw from their argument is that inculpatory statements could never be admitted under the penal interest exception, a result unintended by the drafters of the rule, which renders MRE 804(b)(3) meaningless.

[19] See appendix A.

der these facts, I believe that reliability and truthfulness were clearly established.

Walter Miller had also fully implicated himself as an aider and abettor in the plot to kill Wilbert.[20] Miller did not attempt to shift blame to others, but accurately, and in precise detail, described his role in the events leading to the death of Johnson.

It can be inferred from both statements that Jordan and Miller directly implicated themselves in the crime. Moreover, their own detailed explanations of their personal involvement necessarily intertwined with the actions of Watkins, Phillips, and Hunter. Since the collateral portions of Jordan's and Miller's statements are so closely related in time and context to the inculpatory portion, I have no difficulty finding the inculpatory portion of the statements equally trustworthy. The statements were declarations against Jordan's and Miller's penal interests admissible under MRE 804(b)(3).

III

I also recognize that the penal interest exception, as well as all exceptions to the hearsay rule, raise confrontation questions under the Sixth Amendment and art 1, § 20 of the Michigan Constitution.[21] Indeed, if the Confrontation Clause were read literally, hearsay could never be admitted because a defendant could not confront an accuser.

---

[20] See appendix B.

[21] It is evident that since the adoption of the Federal Rules of Evidence, the United States Supreme Court has consistently harmonized the goal of the Confrontation Clause by interpreting it in a manner sensitive to its purposes and sensitive to the necessities of trial and the adversary process. *Maryland v Craig*, 497 US 836, —; 110 S Ct 3157; 111 L Ed 2d 666, 681 (1990).

The United States Supreme Court has never interpreted the Confrontation Clause absolutely or literally. *Mattox v United States,* 156 US 237, 243; 15 S Ct 337; 39 L Ed 409 (1895); *Maryland v Craig,* 497 US 836; 110 S Ct 3157; 111 L Ed 2d 666, 677 (1990); *Myatt v Hannigan,* 910 F2d 680, 682 (CA 10, 1990). Indeed, the Court recognized that, if applied literally, the clause would abrogate virtually every hearsay exception, a result long rejected as "unintended and too extreme." *Ohio v Roberts,* 448 US 56, 63; 100 S Ct 2531; 65 L Ed 2d 597 (1980). See also *Barker v Morris,* 761 F2d 1396, 1399 (CA 9, 1986) (the clause is given a pragmatic, rather than a rigid, literal construction). Rather, the Court has shaped the profile of the confrontation guarantee by balancing the competing interest of hearsay, *Chambers v Mississippi,* 410 US 284, 295; 93 S Ct 1038; 35 L Ed 2d 297 (1973), with the constitutional protection of confrontation. *Mancusi v Stubbs,* 408 US 204, 213; 92 S Ct 2308; 33 L Ed 2d 293 (1972); *Roberts, supra* at 62, 65.[22] As a result, the Court has required the prosecution to overcome the presumption of unreliability of a nontestifying declarant by establishing both the "unavailability"[23] of the declarant, and that the

---

[22] Justice Blackmun summarized this point in opining:

The Court's cases have construed the Confrontation Clause in a pragmatic fashion, requiring "substantial compliance" with its purposes, see *Ohio v Roberts,* 448 US at 69; *California v Green,* 399 US [149] at 166 [90 S Ct 1930; 26 L Ed 2d 489 (1970)], but acknowledging the need to balance the interests of the accused against the public's "strong interest in effective law enforcement," *Roberts,* 448 US at 64; see also *Mattox v United States,* 156 US 237, 243 (1895). [*Lee v Illinois,* 476 US 530, 557; 106 S Ct 2056; 90 L Ed 2d 514 (1986).]

[23] "Unavailability" is not a prerequisite to the use of hearsay when the states seek to admit a coconspirator's statement made during the progress of the conspiracy. *United States v Inadi,* 475 US 387, 394; 106 S Ct 1121; 89 L Ed 2d 390 (1986). This is because special

hearsay evidence bears "adequate 'indicia of reliability.' "[24] *Id.* at 66. Because the hearsay rules and the Confrontation Clause are designed to protect similar values and stem from the same roots, *Dutton v Evans,* 400 US 74, 86; 91 S Ct 210; 27 L Ed 2d 213 (1970) (plurality), the Court recognized that reliability will be presumed where the "evidence falls within a firmly rooted hearsay exception." *Roberts, supra* at 66. Otherwise, the prosecution must show that the hearsay evidence bears "particularized guarantees of trustworthiness." *Id.*

Central to our analysis of the confrontation implications of the declaration against penal interest hearsay exception is the decision in *Lee v Illinois,* 476 US 530; 106 S Ct 2056; 90 L Ed 2d 514 (1986). In *Lee,* the petitioner and her codefendant were tried jointly in a bench trial at which neither defendant testified. The codefendant, Thomas, had implicated both himself and Lee in the crimes, and the only apparent theory of admissibility of his statements against the defendant was the exception for a declaration against penal interest. The trial judge expressly relied upon portions of Thomas' unredacted statement in finding Lee guilty of murder.

---

characteristics regarding the type of statement constitute evidence which cannot be replicated by in-court testimony at trial.

[24] In *Mancusi v Stubbs, supra,* 408 US 213, the Court articulated the indicia-of-reliability standard as follows:

> The focus of the Court's concern has been to insure that there "are indicia of reliability which have been widely viewed as determinative of whether a statement may be placed before the jury though there is no confrontation of the declarant," *Dutton v Evans* [400 US 74, 89; 91 S Ct 210; 27 L Ed 2d 213 (1970)], and to "afford the trier of fact a satisfactory basis for evaluating the truth of the prior statement," *California v Green,* [n 22] *supra* at 161. It is clear from these statements, and from numerous prior decisions of this Court, that even though the witness be unavailable his prior testimony must bear some of these "indicia of reliability" . . . .

Justice Brennan, writing for a five-member majority, found the state's grounds for holding that Thomas' statement to be reliable with respect to Lee's culpability did not meet the Confrontation Clause standard of demonstrating substantial indicia of reliability, "flowing from either the circumstances surrounding the confession . . . to overcome the weighty presumption against the admission of such uncross-examined evidence."[25] *Lee, supra,* 476 US 546. The majority focused on two factors in reaching its conclusion: the affirmative evidence of the codefendant's blameshifting statement, and the circumstances surrounding the making of the accomplice's confession. The majority first observed that the accomplice confessed in response to questions from the police only after he was told that the petitioner had already implicated him and asked him not to let her take the blame alone. 476 US 544. Second, Justice Brennan noted that the accomplice had considered becoming a witness for the state against the petitioner and, therefore, had an added incentive to shift blame. *Id.* On the basis of these circumstances, the Court concluded that the confession did not bear sufficient indicia of reliability and concluded that the petitioner's Sixth Amendment right of confrontation had been violated.

Justice Blackmun, writing for the dissent, disagreed with the majority conclusions with respect to reliability, stating that "there is little reason to fear that Thomas' statements to the police may have been motivated by a desire to shift blame to petitioner." 476 US 553. He concluded that "in this case the practical unavailability of petitioner's

---

[25] I disagree with my colleagues' conclusion that the *Lee* Court envisioned "a careful and searching analysis of *each specific factual assertion* contained within any broader statement or confession." See *ante,* p 645 (emphasis in original). See discussion pp 693-695.

codefendant as a witness for the State, together
with the unusually strong and convincing indica-
tions that his statements to the police were relia-
ble, rendered the confession constitutionally ad-
missible against petitioner."[26] *Id.* at 557.

The reliability concerns that were present in the
facts of *Lee* are not present in the instant case.
There is no affirmative evidence of blameshifting
on either Jordan's or Miller's statements. Jordan
and Miller both confessed to participating in the
kidnapping of Payne and conspiracy to murder
Desmond Wilbert. Moreover, the testimony from
the pretrial suppression hearing confirms that
Jordan, who confessed within an hour of his ar-
rest, and Miller, who confessed after reading a
newspaper article describing the event and the
defendants, spoke freely to the police and were not
offered leniency in exchange for their statements.
Both statements were declarations against penal
interest and were properly admitted at trial.

Recently, the United States Supreme Court re-
affirmed this approach to evaluating confrontation

[26] The *Lee* Court did not hold, as the lead opinion suggests, that an
inculpatory statement admitted under the penal interest exception
violates the Confrontation Clause, nor does the opinion suggest that
the typical *Roberts* analysis is inapplicable when an inculpatory
statement is introduced under the penal interest exception. See *ante,*
pp 655-656. The majority in *Lee* declined to accept the invitation to
treat this statement as a simple declaration against penal interest.

> We reject respondent's categorization of the hearsay involved
> in this case as a simple "declaration against penal interest."
> That concept defines too large a class for meaningful Confron-
> tation Clause analysis. *We decide this case as involving a
> confession by an accomplice which incriminates a criminal
> defendant.* [*Lee,* 476 US 544, n 5. Emphasis added.]

The Court in *Lee* left open the situation that we are addressing today.
That is, determining whether a statement introduced as a declaration
against penal interest of one person, admitted substantively against a
codefendant under circumstances in which the codefendant had no
opportunity to confront and cross-examine the declarant and found
reliable by the trial court, violates the Confrontation Clause.

challenges under the general test set out in *Ohio v
Roberts, supra. Idaho v Wright,* 497 US 805; 110 S
Ct 3139; 111 L Ed 2d 638 (1990). In *Wright,* the
Court was asked to consider whether certain state-
ments made by a sexually abused child declarant
to an examining pediatrician violated defendant's
rights under the Confrontation Clause. In applying
the *Roberts* analysis to the facts of the case, the
Court first found that the declarant was unavail-
able within the meaning of the Confrontation
Clause. *Id.,* 111 L Ed 2d 652. The Court then found
that the residual hearsay exception, Idaho Rule of
Evidence, § 803(24), is not firmly rooted for Con-
frontation Clause purposes.[27] The Court then deter-
mined whether the state had carried its burden of
overcoming the presumption of unreliability by
establishing facts that the declarant's statement
bore the indicia of reliability through a showing of
the "particularized guarantees of trustworthiness."

In evaluating the state's evidence, the Court
held that the declarant's statement was unreliable
for Confrontation Clause purposes because the
Idaho Supreme Court had relied on corroborating
evidence to determine if the child declarant was
telling the truth. The Court held that the inquiry
into reliability must be drawn from a totality of
circumstances that surround the making of the
statement alone. *Wright,* 111 L Ed 2d 655-656.

The difference between *Wright* and the instant
case rests on the hearsay exception and the foun-
dation required under each one. *Idaho v Wright*
dealt with the miscellaneous hearsay exception
where the only foundation was indicia of reliabil-
ity. The *Wright* Court said that corroboration

---

[27] The *Wright* Court noted that the residual hearsay exception
"accommodates ad hoc instances in which statements not otherwise
falling within a recognized hearsay exception might nevertheless be
sufficiently reliable to be admissible at trial." 111 L Ed 2d 653.

cannot support the introduction of the statement. In the instant case, however, the foundation for declarations against penal interest requires much more than indicia of reliability—it requires unavailability and establishing that the statement is so contrary to the declarant's penal interest that a reasonable person would not have made it unless it were true. While it is unclear as to what extent *Idaho v Wright* permits inquiry into corroborating evidence, outside the residual hearsay exception, to support a declarant's statement, I am persuaded that even under *Wright,* it may be appropriate to look at other evidence to determine if the statement is trustworthy.

For example, in the instant case, Miller made a statement that he was the driver and not the shooter. The question, therefore, becomes was Miller attempting to shift blame or exculpate himself? By examining Bernard Payne's testimony and Kerry Jordan's statement, it is evident that Miller was telling the truth.

The United States Supreme Court has approved this mode of inquiry in *Cruz v New York,* 481 US 186; 107 S Ct 1714; 95 L Ed 2d 162 (1987). In *Cruz,* the majority reasoned that the interlocking nature of a codefendant's confession goes to the "reliability" of the statement, not to harmfulness. *Id.* at 192. The Court concluded that the codefendant's statement "confirms essentially the same facts as the defendant's own confession [and makes] it . . . more likely to be true." *Id.* Likewise, in the instant case, Jordan's statement confirms the facts in Miller's statement, as does Miller's in Jordan's. This, in my opinion, makes the statements more likely to be true.

I also believe that even without the corroborating evidence, the circumstances surrounding the

making of the statement are sufficient for Confrontation Clause purposes.

The defendants do not dispute that codefendants Jordan and Miller, who made the statements and refused to testify at trial, were "unavailable" within the meaning of MRE 804(a). The inquiry, therefore, is, first, whether the circumstances surrounding the making of Jordan's and Miller's statements exhibit sufficient "indicia of reliability" to justify their admission as substantive evidence, and, second,[28] if reliability is found, whether the statements bear the "particular[ ] guarantees of trustworthiness" that are required by the state to introduce the statements against the codefendants, notwithstanding the fact that they had no opportunity to cross-examine the declarant.

I find factors outlined in *United States v Layton,* 855 F2d 1388, 1402 (CA 9, 1988), persuasive in testing the trustworthiness and reliability of inculpatory against interest statements. In *Layton,* the government sought a pretrial ruling to allow it to introduce certain statements, under the declaration against penal interest exception, made by the former Jonestown cult leader, Jim Jones, to his attorney that implicated himself and Layton in the killing of Congressman Leo Ryan. After Layton was convicted, and upon his second appeal, the Court of Appeals explained why the proferred statements satisfied the requirements of FRE 804(b)(3). In doing so, the *Layton* court outlined a

---

[28] The United States Supreme Court has not decided whether a declaration against penal interest "falls within a firmly rooted hearsay exception." Wigmore traced the development of the rule and concluded that a declaration against penal interest is firmly rooted in the common-law hearsay exceptions and is presumptively reliable. While the majority in *Lee v Illinois* did not address this issue, four justices issued an opinion finding that FRE 804(b)(3) is indeed a firmly rooted exception. *Id.* at 551-552 (Blackmun, J., joined by Burger, C.J., Powell and Rehnquist, JJ.).

number of factors to consider in determining whether a statement overcomes the presumption of unreliability:

> 1. Was the statement made voluntarily? [*Barker v Morris,* 761 F2d] at 1401; *Steele v Taylor,* 684 F2d 1193, 1204 (CA 6, 1982), cert den 460 US 1053; 103 S Ct 1502; 75 L Ed 2d 932 (1983);
>
> 2. Was the statement made contemporaneously with the occurrence of the events it references? *United States v Nick,* 604 F2d 1199, 1204 (CA 9, 1979) (per curiam);
>
> 3. Did the declarant admit that he committed acts contrary to his penal interest or likely to bring him into disrepute? *Barker,* 761 F2d at 1401-[14]02;
>
> 4. Was the statement corroborated? *Id.* at 1402; *Nick,* 604 F2d at 1204; *United States v West,* 574 F2d 1131, 1135 (CA 4, 1978).
>
> 5. Did the declarant have personal knowledge of the matters addressed in the statement? *Barker,* 761 F2d at 1402;
>
> 6. Was the statement uttered spontaneously? *Dutton v Evans,* 400 US 74, 88-89 . . . ; and
>
> 7. Was the person to whom the statement was made someone to whom the declarant would likely speak truthfully? *Nick,* 604 F2d at 1204. It should be reiterated, however, that "[t]he reliability factors discussed in other cases 'are not to be considered exhaustive, nor are all factors required to be present in order to admit the declarations.'" *Barker,* 761 F2d at 1403 (quoting *United States v Fleishman,* 684 F2d 1329 [CA 9, 1982], cert den 459 US 1044; 103 S Ct 464; 74 L Ed 2d 614 [1982]). [*Layton,* 855 F2d 1405.]

In applying the *Layton* factors to the instant case, I believe the reliability requirement of the Confrontation Clause has been met.

Before trial, Judge Heading conducted a

*Walker* [29] hearing to determine if the statements were voluntarily given or if the police offered leniency in exchange for Jordan's, Miller's, or Watkins' statements. An examination of the circumstances surrounding the taking of the statements by Judge Heading, as reviewed by the Court of Appeals, revealed that Jordan, Miller, and Watkins voluntarily spoke to the police and were not offered "leniency in exchange" for their statements.[30] Furthermore, before the statements were introduced at trial, Judge Talbot conducted another hearing to determine if the circumstances surrounding the taking of the statements violated the codefendant's confrontation rights. In my opinion, the pretrial inquiry, and the in-court hearing, were the keys in determining whether Jordan and Miller were particularly likely to be telling the truth when the statements were made. *State v Earnest (On Remand)*, 106 NM 411, 412; 744 P2d 539 (1987); *Steele v Taylor*, 684 F2d 1204.

Moreover, I would find that both Jordan and Miller made statements that were so far contrary to their own penal interest that they had to be true.[31] This is evident by the fact that they admit-

[29] *People v Walker (On Rehearing)*, 374 Mich 331; 132 NW2d 87 (1965).

[30] Jordan and Miller gave their statements to police officers while in custody. This, of course, cuts against the reliability concerns of *Layton* and the trustworthiness guarantees required by *Ohio v Roberts,* and *Lee v Illinois, supra.* In my opinion, the presumption of unreliability has been overcome in this case because the trial court found that the statements were voluntarily made and no leniency in exchange for the statement occurred before trial. Moreover, the other factors of reliability which have been established support our conclusion that the statement bears the guarantees of trustworthiness required by the Confrontation Clause.

[31] I find my colleagues' statement that "common knowledge 'on the street'" supports their theory that Jordan and Miller believed that substantial benefits would be gained by "coöperating with the police and 'naming names'" remarkable. See *ante,* pp 659-660. Why would a person with "common knowledge on the street" confess crimes punishable by *life without parole*? What benefit is derived from inculpat-

ted crimes punishable by life sentences. *Barker,*
761 F2d 1401-1402. Furthermore, both Jordan and
Miller demonstrated their personal knowledge of
the matters addressed in the statements. This is
evident from the accurate detail of the shooting
three months after the event occurred, *Barker,*
*supra,* 761 F2d 1402, and that both confessed their
participation in the shooting near or shortly after
their arrests. *Dutton v Evans, supra,* 400 US 88-89.
More importantly, there is nothing in the record
to support an inference that either Jordan or
Miller made the statements implicating the others
in an attempt to avenge himself, or to demonstrate
that he was motivated by a desire to curry favor
with his interrogators, or that the state gave ei-
ther any reason to believe that it would help if he
inculpated others. *Lee v Illinois,* 476 US 545.[32]

I agree with the trial court and the Court of
Appeals that with respect to all material points,
the confessions are consistent and bear the partic-
ular guarantees of trustworthiness required by the
Sixth Amendment. Both detail the obtaining of the
gun from Cliff Harris, the kidnapping of Bernard
Payne and his subsequent interrogation, and the
events, orchestrated by Hunter, which led to the
attempt to murder Wilbert and the killing of
Voncie Johnson. Jordan and Miller both placed an
Uzi in the hands of Jordan and Phillips, and a .357
magnum in the hands of Watkins.

---

ing codefendants in a crime, when the confessor *will never be able to*
*associate with society again?*

[32] In my opinion, my colleagues have relied more on speculation,
rather than on the facts in the record and a proper understanding of
*Lee v Illinois,* in criticizing my discussion concerning the trustworthi-
ness of Jordan's and Miller's statements. See *ante,* pp 657-666. There
is always room for speculation in a criminal trial. Yet when the facts
so overwhelmingly support the conclusion that the statements bear
the guarantees of trustworthiness, as in this case, I can only believe
that the inculpatory statements were properly admitted against penal
interest under MRE 804(b)(3).

The Confrontation Clause reliability and trust-
worthiness concerns are dispelled in the instant
case because each statement truly meets the foun-
dational requirements for a declaration against
penal interest. I have no difficulty concluding
" 'that a reasonable [person] in [Jordan's and Mill-
er's] position[s] would not have made the state-
ment[s] unless [they] believed [them] to be true.' "
*United States v Vernor,* 902 F2d 1182, 1187 (CA 5,
1990).

In my opinion, the presumption of unreliability
has been overcome, and therefore, the defendants'
confrontation challenge must fail.

### IV

I respectfully disagree with my colleagues' opin-
ion because it requires a trial court to examine
each factual assertion "as narrowly and specifical-
ly as reasonably possible," and have the trial court
separately ask whether "*each specific assertion* is
so intrinsically against the declarant's interest
that a reasonable person would not have said it
unless it were true." See *ante,* p 646. The main
reason for my disagreement with the rule advo-
cated by the lead opinion is that its premise vio-
lates the constitutional holding of *Chambers v
Mississippi, supra.* In *Chambers,* the trial judge
refused to admit the confession of another person
that would have exculpated the defendant. Be-
cause the excluded testimony "bore persuasive
assurances of trustworthiness" and was "critical to
Chambers' defense," the United States Supreme
Court found a Fourteenth Amendment due process
violation and held the exclusionary principle of
the hearsay rule "may not be applied mechanisti-
cally to defeat the ends of justice." 410 US 302. As
did the *Chambers* Court, in the instant case I

would consider a number of factors bearing upon the question of trustworthiness.

> First, each of [the declarant's] confessions was made spontaneously to a close acquaintance shortly after the murder had occurred. Second, each one was corroborated by some other evidence in the case . . . . Third, whatever may be the parameters of the penal-interest rationale, each confession here was in a very real sense self-incriminatory and unquestionably against interest. [410 US 300-301.]

The existence of indicia of reliability led the Court to find a denial of due process in the exclusion of the confessions. It is clear that *Chambers* neither places a limit upon the admissibility of declarations against penal interest nor establishes the enumerated trustworthiness factors as prerequisites to admissibility for each proffered declaration. Moreover, if one carried the lead opinion's argument to its logical conclusion, a trial judge could preclude a statement offered by a defendant which inculpates a codefendant declarant and exculpates the defendant who seeks its admission. This evidentiary barrier, suggested by my colleagues, clearly violates the Due Process Clause of the Fourteenth Amendment.

The second reason for my disagreement with the rule advocated by the lead opinion is that the cases cited as supporting their position *do not reject the carry-over rule.* Rather, these courts have held that inculpatory statements were erroneously admitted because they did not meet one of the factors of trustworthiness. See *ante,* pp 639-643.

For example, in *United States v Sarmiento-Perez,* 633 F2d 1092, 1102 (CA 5, 1981), the court held that a declarant's statement was not

sufficiently against his own penal interest and, therefore, admitted in error. Also, in *United States v Bailey,* 581 F2d 341, 348 (CA 3, 1978), the court ruled that a statement introduced under the residual hearsay exception, rule 804(b)(5), not 804(b)(3) as in this case, lacked the " 'guarantees of trustworthiness' " required by that rule. In a footnote, the court also held that the trial court properly denied the admission of the statement under FRE 804(b)(3) because the testimony of an FBI agent at trial indicated that the declarant was aware of the possible lenient treatment he could receive if he would implicate his role in a robbery and inculpate the role of the accomplice. The court opined that this fact indicated a lack of reliability in the statement. 581 F2d 346, n 4. Furthermore, in *United States v Palumbo,* 639 F2d 123, 128 (CA 3, 1981), the court held that a declarant's inculpatory statement in a cocaine case lacked the indicia of reliability required by FRE 804(b)(3). Additionally, in *United States v Riley,* 657 F2d 1377, 1384 (CA 8, 1981), the court held that although a declarant's statement was against interest, considering the circumstances of the taking of the statement, that the declarant was in police custody and informed that a conviction could jeopardize the custody of her child, the criteria of trustworthiness was not met.

As can be seen from the foregoing review of the cases relied on by my colleagues, they hold that trustworthiness was lacking in the making of the statements. They do not reject the rule of law I propose today. I believe that the factors of trustworthiness, outlined in *Layton* and *Chambers,* support my position that upon evaluation of the facts in the instant case, the defendants' confrontation rights were not violated.

CONCLUSION

I would find that Jordan's and Miller's statements bore sufficient indicia of reliability to overcome the presumption against their admission into evidence. I am not persuaded that the trial court erred in permitting the jury to consider substantively the statements of Jordan and Miller as declarations against penal interest, because the guarantees of trustworthiness required by the Confrontation Clause have been met and, therefore, the defendant's confrontation rights were not violated. I would affirm the decision of the Court of Appeals.[33]

BOYLE and MALLETT, JJ., concurred with RILEY, J.

### APPENDIX A

The defendants are repeatedly referred to in Jordan's and Miller's statements by the following nicknames:

| | |
|---|---|
| Wendall Henry | - "FARMER" |
| Donald Watkins | - "DUCK" |
| Kerry Jordan | - "K-9" |
| Desmond Wilbert | - "D" OR "DES" |
| Michael Hunter | - "B" OR "BAM" |
| Christian Phillips | - "CHRIS" |
| Walter Miller | - "PETER-PAUL" |
| Bernard Payne | - "NARD" |

The jury considered the following confession from Kerry Jordan:

---

[33] The result reached by the lead opinion and the concurring opinion is that this case shall be remanded for a new trial without the use of Jordan's and Miller's statements. Since a majority has not been reached regarding how inculpatory statements can be used in future cases, they leave this issue open for another day.

*Q.* Mr. Jordan, [h]ave I explained your constitutional rights to you?

*A.* Yes.

*Q.* Do you understand them?

*A.* Yes.

*Q.* Are you willing to give me a statement regarding the fatal shooting of Voncie Johnson which occurred on [8]-26-86 on Cloverlawn?

*A.* Yes.

*Q.* Are you giving the statement freely and voluntarily?

*A.* Yes.

*Q.* Have I or any officer threatened you or promised you anything?

*A.* No.

*Q.* Why are you telling me?

*A.* Because I'm not going to take the fall alone.

*Q.* Tell me what happened.

*A.* A guy, Cliff owed me a pistol. He used to work for me and quit coming around. Duck, another guy who worked for me came over to 9555 Pinehurst and said that Cliff was at home. Then me, Peter-Paul, Chris went in a black [C]ougar and drove over to Cliff's house. Duck and another guy followed us in their car. We got the gun from Cliff and Duck got in the car with us. Duck said, "I just [saw] Nard go to the store, we should get him." We parked the car and waited for Nard. Peter-Paul and Chris got out of the car with Duck. They waited by the alley for Nard and brought him back to the car.

*Q.* Were they armed?

*A.* Yes, Chris had an Uzi, Duck had the gun we got from Cliff, Peter-Paul didn't have anything.

*Q.* Okay, continue.

*A.* When we got him to the car Duck and Chris, no Duck and Peter-Paul got in the back seat with him. They made him bend over and we went back to 9555 Pinehurst. We all went into the basement and they questioned him. They were questioning him about a guy name[d] D. I went outside. Then B came to the house. I told B we got Nard in the

basement and we went downstairs. B asked Nard something but I don't remember what. Nard said I'll beep D because he didn't want us to kill him. Duck said come on, let's go beep him. Me, Chris, Peter-Paul, Duck and Nard drove over to the Mendota and Nard beeped D.

*Q.* Who lives on Mendota?

*A.* A friend of ours, Mary.

*Q.* Okay, continue.

*A.* Chris gave Nard an address off the top of his head on Cloverlawn and Nard gave it to D. B was there with us. After we made the call, me, Chris, Duck, Peter-Paul and Nard went on Cloverlawn. At first we just drove down the street. We [saw] D parked near Tireman. He was pulling off and we were behind him. We went back to Mendota and Nard beeped him again. I don't remember if B was there or not. After Nard called, we went back on Cloverlawn, me, Chris, Peter-Paul, Duck and Nard and parked. We gave him another address this time. Me, Chris, Duck and Nard got out of the car. We told Nard to go and stand in front of the address we gave D. We waited about twenty or thirty minutes and decided to leave because it was raining a little bit and D had not showed up. We all got back into the car and started to leave and that's when we saw D. We came around the block and parked on the side street, I think it was Belton; but I'm not sure. Me, Chris and Duck got out. Me and Chris went to one side of the street. Duck was on the other. We were walking towards D. He was on Duck's side of the street coming off the porch. D went to get in his car. That's when the shooting started. D took off in his car. We went back to our car and went back on Pinehurst. Duck and Nard got out and we got out for a while. Then [m]e, Peter-Paul and Chris left.

*Q.* Was D alone in the car?

*A.* Now [sic], there was another guy in the car with him.

*Q.* Did D or the other guy return fire?

*A.* I don't think so.

*Q.* What kind of gun did you, Duck and Chris have?

*A.* Me and Chris had Uzi's, Duck had a .357 mag, the gun we got from Cliff.

*Q.* Why did you guys want to kill D?

*A.* Because Nard was working with us, then he quit us and was working for D. It was really Duck who wanted him.

*Q.* What happened to the guns?

*A.* I threw mine away on State Fair, near Cameron. I don't know what Chris or Duck did with theirs.

*Q.* How many shots did you fire?

*A.* I'd say about ten.

*Q.* How far away from D were you?

*A.* About five or ten yards away.

*Q.* Did B know what was going down?

*A.* Yes.

*Q.* What are the names of the following people?

1. K-9? That's me.

2. Duck? I don't know but he stays on Cameron.

3. Chris? I don't know his name either. He stays on Woodingham.

4. B? We call him Bam. I don't know where he stays.

5. Peter-Paul? His first name is Walter. I don't know where he lives.

*Q.* Have you read your statement?

*A.* Yes.

*Q.* Are there any corrections?

*A.* Yes, when we picked up Nard, Duck stayed in the car, Chris and Peter-Paul got out. Chris had the Uzi, Peter-Paul had the .357.


### APPENDIX B

The jury considered the following confession from Walter Miller. (See Appendix A as a guide for the nicknames used throughout the statement.)

*Q.* Mr. Miller, have I explained your Constitutional Rights to you?

*A.* Yes.

*Q.* Do you understand them?

*A.* Yes.

*Q.* Have I or has any police officer threatened you or promised you anything?

*A.* No.

*Q.* Are you willing to give me a statement regarding the fatal shooting of Voncie Johnson which occurred 8-26-86 on Cloverlawn in the City of Detroit?

*A.* Yes I am.

*Q.* Are you giving me this statement freely and voluntarily?

*A.* Yes.

*Q.* Tell me what happened on that date.

*A.* A guy named Cliff and some other guy were working for the Farmer, both of them quit working for Farmer about four months before he, Farmer got killed. When they quit working for us they kept a .357 revolver, which was a house gun for the East side house that they ran. On the day the shooting happened, Duck came over to 9555 Pinehurst and said that Cliff wanted to give the gun back to us. B, Michael instructed us to get the gun. Me, Chris Phillips, K-9, Kerry, went in a black [C]ougar, I think it's a 1979, over to Cliff's house. Duck and a guy who I don't know got into a blue car and led the way to Cliff's. When we got to Cliff's he was on the porch, K-9 got the gun from him, then Cliff's mother came out and came up to our car and said hello. Before we left Duck got out the car he was in and got into our car. After we got the gun we left.

*Q.* Was anyone in the car armed before Cliff gave you the revolver?

*A.* Yes, K-9 had a Mack-10, Christian Phillips had a Uzi 9mm, I was unarmed, and Duck got the .357 from Cliff; but it wasn't loaded. The rest of the guns were loaded.

*Q.* Okay, continue.

*A.* We were just going around the block when Duck spotted a gun [sic] who was walking out of a

store. Duck said, that's, then he said the guy's
name; but I don't remember the name. We turned
the corner and pulled over. Chris and me got out
of the car and walked to an alley. Chris got behind
a garbage dumpster and I was in front of it. The
guy who was walking came across the street and
started turning into the alley when I stopped him.
I said don't move. The guy stopped and said don't
kill me. Chris jumped out and was standing behind
me. I grabbed the guy and walked him to the car
and put him in the back seat with Duck, then I got
in the back seat with him.

*Q.* Were either you or Chris armed?

*A.* Yes, I had the .357, it was unloaded, Chris
had the Uzi.

*Q.* Okay, continue.

*A.* When we got the guy into the back seat, I
told him to lady [sic] down on the floor and he did
and we went back to 9555 Pinehurst. When we got
there Chris, K-9 and Duck took him into the base-
ment. I went upstairs and took care of a customer.
B was not at the house when we first arrived,
either Chris or K-9 went down the street, found B
and told him what had happened. B then came
back to the house with either Chris or K-9 and
went into the basement. I was still upstairs with
the customer; but when B arrived I went down-
stairs to see, to see what he had to say. Me, Chris
and B were in one part of the basement talking
about what happened. We told him about us going
over there and getting the gun, and bringing the
guy back with us. I went back upstairs with the
customer and they all stayed downstairs. I could
hear them talking; but I couldn't hear what they
were actually saying. Chris, K-9, B and Duck and
the other guy left. They were gone for about five
minutes and they all came back. They stood at the
side of the house and were talking, by that time I
was walking the customer to the door, she left and
the guys got back into the [sic] and left again.
About three to five minutes later a guy I know as
C came over, I asked him if he knew where the
guys were and he told me that they were around

the corner. I left 9555 Pinehurst and went over to
Mendota where they were. When I got to Mendota
I went up on the porch and Chris, K-9, B, Duck and
the other guy sat on the porch talking about the
guy who had beeped, all I remember is that the
guy said he was waiting for someone to call him
back.

*Q.* Okay, continue.

*A.* We stayed on the porch for about fifteen
minutes, and I went back on Pinehurst to check on
the house, and then went back to Mendota. Every-
one was still on the porch and I joined them. The
guy finally called, when he called I was back on
Pinehurst checking the house. I went back on
Mendota and got the car and went and bought
some gas and returned to Pinehurst. Everyone was
there, Chris, B, K-9, Duck and the other guy. I
parked the car and me, Chris, K-9 and B just
started walking down the street and talking.
That's when I found out what was going down. B
told me to get into the car and drive to Mendota
and Westfield with the guy, and wait. I went back
to Pinehurst, got the guy, put him in the car and
went to where B told me to go. I parked the car
and waited for about five to ten minutes. Chris, K-9,
and Duck came and got into the car, Chris told
me to drive over on Cloverlawn because we were
going on a mission and that we were going to meet
the guy on Cloverlawn. I drove to Cloverlawn
between Belton and Tireman, when we got there
the guy who I took out of the Pinehurst house
pointed out a little red car and said that's them.
They [sic] guy was coming off of the porch and was
getting into his car, I speeded up to try to catch up
with him, but he pulled off. He made a right on
Tireman and circled the block. I tried to follow
him but lost him. I caught back up with him on
the sidestreet off of Tireman, I followed him and
stopped on Brighton and Majestic. Chris, K-9 and
Duck got out of the car and started to walk up
Majestic towards the red car. Duck went into the
alley. Chris and K-9 stayed on the sidestreet. By
the time they got there the guy was gone. They

came back into the car and I tried to follow the
guy; but I lost him. We went back on Mendota,
Chris, K-9, Duck and the other guy went inside, I
drove off and went and made a phone call. I went
back to the house on Mendota, and stood on the
porch. All of them came out, Chris, K-9, Duck, B
and the guy. B was mad. He didn't say anything
but by knowing him I could tell he was mad. Chris
or K-9 said let's go and I got back in the car with
Chris, K-9, Duck and the other guy. Chris told me
to go back on Cloverlawn and that they called the
guy again and had given him another address. I
drove to Cloverlawn and the red car wasn't there.
We sat there for about five minutes and pulled off.
I drove back to Joy [R]oad, while driving east on
Joy [R]oad we spotted the red car going west, by
the railroad tracks. I turned on Alpine then right
on Tireman, then to Roselawn. When I got to
Roselawn and Belton, we saw the red car making
a right onto Belton then another right onto North-
lawn, heading to Joy [R]oad. I turned left on
Belton to Cloverlawn then turned on Cloverlawn I
proceeded towards Joy [R]oad. While driving down
Cloverlawn I saw the red car on Mackenzie, I
made a left on Joy [R]oad, Chris, K-9 and Duck
were out of the car by this time. I dropped them
off on Cloverlawn by the alley, I went into a lot on
Northlawn and Joy Road, turned around then
made a left on Joy [R]oad and picked all three of
them up at Cloverlawn and Joy [R]oad. Once they
got into the car I drove to Roselawn and made a
right, going back to Tireman, then another right
on Belton. I cruised up to the alley with the lights
off and stopped. Chris, K-9 and Duck got out of the
car and walked up to Cloverlawn. Before they got
out either Chris or K-9 told me to wait and that I
was to crash into the red car if they tried to get
away. As they were walking away from our car I
heard someone say, he turned around. I proceeded
up Belton to Northlawn then to Mackenzie, turned
and parked on the corner of Cloverlawn and Mac-
kenzie. I saw the red car, it was like in the middle
of the block. By the time I parked the shooting

started. The red car pulled off, I realized that I wasn't where I was supposed to be and pulled off behind him. The red car made a left on Tireman, I stopped on Cloverlawn and Belton and picked up Chris, K-9 and Duck. We tried to chase the car but he got away. We went back to the house, Wykes, that's where we followed him to earlier, but he wasn't there. Then we went back to Mendota, Chris, K-9, Duck and the other guy got out. I went and made another phone call and then went back to Mendota. Everyone was on the porch, Chris, K-9, Duck, B and the other guy. They took the car and told me to meet them back on Pinehurst. I walked back to Pinehurst, 9555, we all went inside and talked about what happened. Everyone was mad at me and blamed me for missing the guy. B told me you better start learning how to think. The guy who I didn't know said you just signed my death warrant. We also discussed what to do with the guy who I didn't know. B said to let him go. I left and went to my mother's house. Everyone was still on Pinehurst when I left.

*Q.* What type of weapons did the three guys have who did the shooting?

*A.* Chris and K-9 had Uzi's, Duck had the .357.

*Q.* Who loaded the .357?

*A.* I don't know but before Duck left the car he checked it and said it was loaded.

*Q.* Did you fire any shots?

*A.* No I did not.

*Q.* Do you know [why] the hit was ordered?

*A.* No I don't.

*Q.* Who ordered it?

*A.* B is the boss and he would have had to order the hit or approve of it.

*Q.* Could you tell [how] many people were in the red car?

*A.* Two men.

*Q.* Do you have a nickname?

*A.* Yes, Peter-Paul.

*Q.* How many shots were fired?

*A.* No I don't.

*Q.* Do you know who the men in the red car were?

*A.* No I don't.

*Q.* What relationship between you, Chris, K-9, Duck and B, Michael?

*A.* Me, Chris and B grew up knowing each other. I met K-9 after I got with the crew and that's also when I met Duck. B was in the narcotics business. He was an underboss enforcer for and body guard for Farmer, he's the guy who got killed on the expressway, Wendell Henry. After he got killed, B kind of took over Farmer's action, he was still working for someone, but I don't know who. Me, Chris, K-9, were the enforcers for B. An enforcer is a person who makes sure everything is going all right, and who straightens things out if there [sic] not.

*Q.* Do you know what happened to the guns that were used?

*A.* They were kept by the guys who had them.

*Q.* Have you read the statement?

*A.* Yes I have.

*Q.* Are there any additions or corrections you want made?

*A.* The only other thing is that it was not a planned hit for that day, we were only supposed to get the gun, the rest just happened afterwards.

*Q.* If a hit would be planned ahead of time, would you be informed of it?

*A.* No, that would be between B, Chris, and K-9, all I would do is drive, and I wouldn't find out until it was about to happen.